STERN v. INTERNATIONAL RY. CO. et al.   (No. 55/3.)

(Supreme Court, Appellate Division, Fourth Department.   April 28, 1915.)

1. MUNICIPAL CORPORATIONS  ⊚⟿706—USE OF STREETS—COLLISIONS—NEG-
LIGENCE.
    The driving of an automobile faster than permitted by an ordinance de-
claring that the driving of an automobile more than 18 miles an hour is
presumptive evidence of imprudent driving and requiring operators to
drive prudently and at a speed which will not endanger the property or
life of any person, is only presumptive evidence of negligence of the
driver; but the question of negligence is for the jury, where experts
testified that a car could be driven at 20 miles per hour with safety, un-
der conditions existing at the time and place of an accident, and the
evidence was conflicting as to the speed of the car, whether at 6 or 35
miles per hour.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1518; Dec. Dig. ⊚⟿706.]

2. STREET RAILROADS ⊚⟿86—POLES IN STREETS—FAILURE TO REMOVE—LIA-
BILITY FOR INJURY.
    A city, granting to a street railway company authority to electrify a
street railroad operated under a franchise for horse cars, but not desig-
nating the location of necessary poles for trolley wires, may compel the
removal of poles erected in the center of the street, when rendered dan-
gerous by change in the conditions and use of the street; and the negli-
gent failure so to do renders the company liable for damages sustained,
in consequence of the obstructions, by persons lawfully using the street.
    [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 150,
173, 183–185, 187; Dec. Dig. ⊚⟿86.]

3. MASTER AND SERVANT ⊚⟿302—ACTS OF SERVANT—INJURY TO THIRD PER-
SON—LIABILITY OF MASTER.
    The act of the general manager, sales agent, and demonstrator of a
motor car company in driving a car of the company is prima facie within
the scope of his duties, and the mere fact that he invited persons to ride
with him did not show that he acted outside the scope of his employment,
so that the company was liable for his negligence.
    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1217–
1221, 1225, 1229; Dec. Dig. ⊚⟿302.]

4. TRIAL ⊚⟿140—QUESTION FOR JURY—CREDIBILITY OF WITNESSES.
    The credibility of an interested, but uncorroborated, witness is for the
jury.
    [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 334, 335; Dec. Dig.
⊚⟿140.]

5. NEGLIGENCE ⊚⟿15—CONCURRING NEGLIGENCE—LIABILITY.
    Where one receives an injury from two concurring causes, in the ab-
sence of either of which no accident would have occurred, the persons
responsible for each cause are jointly liable.
    [Ed. Note.—For other cases, see Negligence, Cent. Dig. § 18; Dec.
Dig. ⊚⟿15.]

6. MUNICIPAL CORPORATIONS ⊚⟿661—HIGHWAYS—REGULATION—LEGISLATIVE
AUTHORITY.
    The Legislature, acting for the people, has paramount authority over
the highways for travel, subject to the limited rights of abutting property
owners and local authorities; but the local authorities may not abridge
or curtail the public rights in the highways.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
1432, 1434–1436; Dec. Dig. ⊚⟿661.]

⊚⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. STREET RAILROADS ⊂⟹81—FRANCHISES—LEGISLATIVE AUTHORITY.
    A street railway company, obtaining a franchise to operate cars over streets, can only exercise its rights in a reasonable manner, and so as not to unnecessarily interfere with the rights of the public.
    [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 172–177; Dec. Dig. ⊂⟹ 81.]

8. STREET RAILROADS ⊂⟹117—FRANCHISES—LEGISLATIVE AUTHORITY.
    Whether a street railway company, obtaining from a city permission to electrify its lines, was negligent in maintaining trolley wire poles in the center of the street, *held*, under the evidence, for the jury.
    [Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 239–257; Dec. Dig. ⊂⟹117.]

9. MUNICIPAL CORPORATIONS ⊂⟹692—OBSTRUCTIONS IN STREETS—LIABILITY.
    A city must keep its streets free from obstructions which are unauthorized, and must remove unnecessary obstructions, and where it fails to do so it is guilty of permitting a nuisance.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1493; Dec. Dig. ⊂⟹692.]

    Kruse, P. J., and Lambert, J., dissenting.

Appeal from Trial Term, Erie County.

Action by Edith M. Stern, as administratrix of Philip H. Stern, deceased, against the International Railway Company and others. From a judgment for plaintiff, and from an order denying a motion for new trial, made on the usual grounds, defendants appeal. Affirmed.

Argued before KRUSE, P. J., and ROBSON, FOOTE, LAMBERT, and MERRELL, JJ.

Porter Norton, of Buffalo (Norton, Penny, Spring & Moore, of Buffalo, of counsel), for appellant International Ry. Co.

George E. Pierce and William S. Rann, Corp. Counsel, of Buffalo, for appellant City of Buffalo.

Clinton B. Gibbs, of Buffalo, for appellant Windsor Motor Car Co.

Thomas A. Sullivan, of Buffalo (Sullivan, Bagley & Wechter, of Buffalo, of counsel), for respondent.

MERRELL, J. This action is brought by the plaintiff, Edith M. Stern, as administratrix of the estate of her deceased husband, Philip H. Stern, to recover damages for the benefit of herself, as widow, and two small children, a boy and a girl, as next of kin surviving her said husband, upon the theory that his death was caused by the negligence of the defendants.

Plaintiff's intestate was killed on the evening of April 23, 1912, at about dusk, by being thrown from an automobile in which he was riding on Main street in the city of Buffalo. The automobile was a five-passenger Kline car, and was the property of the defendant Windsor Motor Car Company. Said defendant company was engaged in the sale of motor cars in the city of Buffalo. At the time of the accident the automobile was directly in charge of and being driven by one C. C. Fairman, who was then and for some time prior thereto had been in the employ of said Motor Car Company in the capacity of a general manager, salesman, and demonstrator of cars which said

⊂⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

company had for sale. The evidence would indicate that it was a part of Fairman's duties as sales agent for said Motor Car Company to look up prospective customers for the car which he was selling, and to demonstrate the operation and advantages of the car which he offered to possible purchasers, and that it was customary to take such prospective or possible customers to ride in the car which he was selling. On the evening of the accident Fairman drove the car, already loaded with four passengers besides himself, up to the German-American Restaurant in Buffalo, where plaintiff's intestate and a friend were dining, and invited them to join the party for a ride. Stern demurred at first, suggesting that the car was already loaded to its capacity, and saying that he must go to his home. Upon being further urged by Fairman, plaintiff's intestate took a seat in the tonneau of the car upon the understanding that Fairman would take him home. He was then driven out upon Main street. Stern two or three times suggested to Fairman that he take him home, but the latter insisted on his going for a little ride, and promised to take him home a little later. As the automobile was being driven northerly on Main street, and when near the point where Florida street intersects the same, the car in which plaintiff's intestate was riding caught up to a small runabout automobile which was traveling in the same direction. Just ahead of the small automobile was a mail wagon also traveling north near the curb. As the car driven by Fairman came up behind the runabout, Fairman turned out to the left with a view of passing. He, however, gave no signal of such intention to pass, and just as he turned to the left the small automobile did likewise, with the intention of passing the mail wagon. This movement on the part of the small automobile made it necessary for Fairman to swing out still further to the left, and in doing so his car came in collision with one of the series of iron poles maintained through the center of Main street about midway between curbs to support the electric wires or cables transmitting electric current for the propulsion of the cars of the defendant International Railway Company.

[1] The testimony of the witnesses differs somewhat as to the speed at which Fairman was driving the car when attempting to pass the runabout. One witness puts it as low as 6 miles per hour, while others estimate the speed as about 18 to 20 miles per hour, and still others as high as 35 miles per hour. An ordinance adopted by the city required operators of motor vehicles in the city streets to drive their cars in a careful and prudent manner and at a rate of speed so as not to endanger the property, life, or limb of any person. And the driving of a motor car at the place where this accident occurred at a rate of speed of over 18 miles an hour was, by the ordinance, made presumptive evidence of careless and imprudent driving. Expert evidence was introduced showing that a car could be driven with safety, and under conditions existing at the place and time of the accident, at the rate of 20 miles an hour. From the evidence it is quite probable that Fairman was driving at a rate equal or in excess of that mentioned in the city ordinance; but, even had he exceeded such rate, it was only presumptive evidence of imprudence on his part, and the court very

properly left the question of the driver's carelessness in that respect for the determination of the jury.

[2] Main street, at the point where the accident occurred, was one of the main thoroughfares of the city. Its total width was about 100 feet. Its paved portion between curbs was 50 feet, leaving a space for sidewalk and grass on either side of about 25 feet. Along the paving, midway between the curbs, runs the double surface tracks of the defendant International Railway Company. These tracks are of standard gauge of 4 feet 8½ inches from rail to rail. The distance from the easterly rail of the south-bound track to the westerly rail of the north-bound track was 6.4 feet. Midway between the north-bound and the south-bound tracks the defendant International Railway Company had erected and maintained the line of iron poles before mentioned. These poles were of lattice-work construction, of ¼-inch stuff, somewhat irregular in shape, being about 8½ inches by 6½ inches, riveted together, and were about 18 feet high above the surface of the street. The distance between poles in the vicinity of the accident varied from 121.5 feet to 126.7 feet. They were set in conical bases in the pavement. At the top of the poles were placed arms extending to the east and to the west, supporting the trolley wires over the street railway tracks. The street between curbs was paved with asphalt, except that the space between the street car tracks was paved with stone. Nothing interfered with the passage of vehicles from one side of the street to the other, except the poles of the defendant International Railway Company. The rights of said defendant in said street came originally through a franchise granted by the Legislature to the Buffalo Street Railway in 1866 to construct and operate in said street a surface railway, with horse-drawn cars. The defendant International Railway Company has succeeded to and now owns all the rights granted to the Buffalo Street Railway Company by said franchise. In the year 1889 the common council of the city of Buffalo granted authority to electrify said road, and to operate its cars by means of an electric current by means of a trolley. This, of course, necessitated the erection of poles to support the trolley wires. The location of the poles was not regulated by the city authorities, and the center pole construction was adopted, instead of the double or side pole construction, where the poles might be placed outside the paved portion of the street.

It requires no argument to show that the center pole construction was a more or less dangerous one, with its line of poles sticking up out of the surface of an otherwise clear and unobstructed pavement, as compared with the side pole construction where the poles supporting the trolley wires were entirely outside of the paved portion of the street. But what was originally a palpably dangerous construction became a still greater menace by the introduction into general use of the automobile and self-propelled vehicles. The comparatively slow going horse-drawn vehicles in general use in 1889 could avoid the poles so placed in the center of the street with reasonable safety, but the rapid transit of the motor vehicles which have now come into general use makes a condition once comparatively free from hazard now extremely dangerous. Indeed, the conditions arising out of such center

pole construction became so dangerous in another part of the same street that the common council, in 1909, unanimously adopted a resolution requiring the defendant International Railway Company to remove such center poles, "the same being dangerous to traffic in said street," and in compliance therewith the company removed such center poles and adopted the side pole construction, thus entirely eliminating the poles from the paved portion of the street.

Not only was it within the power of the municipal authorities to remove these obstructions in a public street, rendered dangerous by reason of changed conditions and use of such street, but it was their plain duty to the public to remedy the danger by the removal of the poles. Neglecting to do this, the city clearly became liable for damages sustained by persons lawfully using the street and who suffered injuries due to such obstructions. D., L. & W. R. R. Co. v. City of Buffalo, 158 N. Y. 266, 271, 53 N. E. 44.

It is the contention of the plaintiff that the defendant Windsor Motor Car Company, through its representative, Fairman, was negligent in the management of its car, and that the placing and maintenance of the trolley poles through the center of the street was a negligent act on the part of the defendant International Railway Company, which combined to cause the accident and the death of her intestate; in other words, that the carelessness of the automobile driver, which plaintiff claims was attributable to the Motor Car Company, and the negligent location and maintenance of the poles by the defendant Railway Company, were concurring acts of negligence causing the accident, and that the city of Buffalo, in permitting the obstruction of its street by said poles, suffered a nuisance to exist, and that said city is jointly liable with the other parties defendant. The case was submitted to the jury in a concise and what seems to me to be an extremely able charge, fairly presenting the questions involved.

[3, 4] Considering first the negligence of the defendant Windsor Motor Car Company: The evidence charging said company is not strong. The evidence shows that at the time of the accident Fairman, who drove the car and whose acts are claimed to have been negligent, was the general manager, sales agent, and demonstrator of the defendant in connection with its Buffalo establishment. At the time of the accident he was driving the car of said Motor Company. Such relation ordinarily would make out a prima facie case charging the defendant company with any negligence on his part. McCann v. Davison, 145 App. Div. 522, 130 N. Y. Supp. 475; Norris v. Kohler, 41 N. Y. 42, 44. In a very recent case which passed through this court, the Court of Appeals enunciated the same doctrine. Ferris, as Adm'r, v. Sterling, as Ex'x (Ct. App. Decision, Feb. 25, 1915) 108 N. E. 406.

Of course, the defendant Motor Car Company is only chargeable with the negligence of its driver in case he, at the time, was about the business of his employer. If he was not acting at the time within the scope of his employment, but was on a purely pleasure trip of his own, the company cannot be held liable. The plaintiff claims that in taking these people to ride the demonstrator, Fairman, was showing off

the good points of the car to persons who were liable to purchase, and that therefore he was about his master's work. Plaintiff urges the fact that competition in the sale of automobiles was keen, and that Fairman was acting well within the scope of his employment in demonstrating this car by means of the free ride which he was giving to his passengers when the accident occurred. On the other hand, Colegrove, the treasurer of the Windsor Motor Car Company, testified that he had forbidden Fairman taking the car out after half past 6 o'clock in the evening, and that therefore he was acting at the time of the accident in disobedience of orders. Colegrove's testimony lacks corroboration, and, of course, being an interested witness, his credibility was for the jury. Gulliver v. Blauvelt, 14 App. Div. 523, 43 N. Y. Supp. 935; Cunningham v. Castle, 127 App. Div. 580, 111 N. Y. Supp. 1057.

The question as to whether Fairman's management of the car was negligent was submitted to the jury under proper instructions, and, as well, the question of Stern's freedom from contributory negligence. The jury, by its verdict, resolved those questions in favor of the plaintiff. The court, who heard the witnesses, declined to set aside the verdict as against the weight of the evidence, and I cannot say that he was not justified in so refusing. I cannot say that the jury were not justified in drawing the inference that Fairman, at the time of the accident, was acting in the course of his employment.

[5] As to the question of liability on the part of the International Railway Company, it is undoubtedly the rule that where a person receives an injury resulting from two concurring causes, in the absence of either of which no accident would have occurred, the parties respectively responsible for the concurring causes are jointly liable to a person injured thereby. Thus, if the motor car company was negligent, and it was negligence on the part of the street railway company to have its poles in the center of the street, and those two negligent conditions concurred to cause the accident, plaintiff may hold said defendants jointly. Plaintiff claims that, had the car been driven at a moderate rate of speed, and had the driver signaled the small runabout ahead of his intention to pass, no accident would have happened, and that, even though the motor car driver was negligent, no accident would have occurred when he undertook to pass the preceding car, except for the poles in the center of the street.

[6] Was the maintenance of the poles in the center of the street a negligent act on the part of the defendant International Railway Company? Unquestionably by the franchise granted to its predecessor in interest in 1866 it had the right to maintain a double-track surface line in said street, and subsequently to electrify the same. The Legislature had authority to grant such rights. The state Legislature, acting for the people who use the highways for travel, has paramount authority over the same, subject to the limited rights of abutting property owners and local authorities. Primarily the roads are for the use of the people as a whole. Main street, Buffalo, is a very old thoroughfare, and the rights of the people therein antedate those of either the city or of the railway company. The local authorities have

no power to abridge or curtail the public rights in said street. Berger v. Village of Solvay, 156 App. Div. 440, 141 N. Y. Supp. 995.

[7, 8] When the Legislature granted the franchise, it permitted the railway company to lay its tracks and otherwise exercise its privileges; but it was only permitted to exercise such rights in a reasonable manner and so as not to unnecessarily interfere with the rights of the public therein. Whatever rights to obstruct the street the defendant may possess come from the sovereign power, which is the people, through the Legislature, and from it alone. The Legislature never granted the said defendant authority to maintain an electric trolley line in Main street, with poles in the center of the street. It is true that the city authorities granted permission to substitute electricity for horse power in the operation of said road; but even the city did not attempt to grant permission to stick poles up and down the middle of the paved street. It was powerless to grant such right, and its apparent acquiescence in such construction conferred no rights as against the public. Of course, when permission was granted to substitute electricity for horse power, it became necessary to suspend the trolley wires in some manner; but the defendant railway company was not empowered to select any means of suspension that it might find convenient in total disregard of the rights of the public in the street. Suspending the wires from poles set back of the curbs was manifestly a safer way, and thereby no less effective service could be obtained. Hence the question as to whether the setting of the poles and their maintenance in the center of the street was a reasonable exercise of the franchise granted to the International Railway Company was properly submitted to the jury. Powers v. Village of Mechanicsville, 163 App. Div. 138, 148 N. Y. Supp. 452.

The comparison suggested, that the condition of this line of poles was similar to that of Oxford street in the city of Rochester, where the street is divided by an almost continuous grass plot, with a row of magnolia trees running lengthwise of the street, seems hardly appropriate. Oxford street, Rochester, is a purely residential street, with comparatively little travel, and the grass plots, whereon are planted the magnolias, are curbed, and practically divide the street into two avenues. The jury found, under the submission of the court, that the exercise of the franchise by said defendant was not reasonable, and that its center pole construction was negligent.

[9] The city of Buffalo was charged with the duty of keeping the city thoroughfares free from obstructions which are unauthorized, and it was in duty bound to remove unnecessary obstructions. Neglecting this, it was guilty of suffering a nuisance. Berger v. Village of Solvay, 156 App. Div. 440, 141 N. Y. Supp. 995. That the city was fully advised of the dangerous character of the obstruction, and had ample power to abate the nuisance, is attested by the fact that, pursuant to the demand for the removal of center trolley poles in another part of the same street as dangerous to public travel thereon, said poles were promptly removed by the defendant railway company. It all depends upon the question whether or not the center poles constituted an unwarranted and unreasonable obstruction. If

they did, then they should have been removed by the city. The question as to whether such use was reasonable and proper was submitted to the jury, and by their verdict the jury must be deemed to have found that it was not.

I think the case was properly submitted to the jury, and that the judgment based upon their verdict should be affirmed, with costs. All concur, except KRUSE, P. J., and LAMBERT, J., who dissent.

KRUSE, P. J. (dissenting). I agree with Mr. Justice LAMBERT that the judgment and order should be reversed and a new trial ordered against the Windsor Motor Car Company, upon the ground that the verdict is against the weight of the evidence.

2. As to the other defendants, I am unable to see how there can be any liability upon the ground of negligence, if none exists for maintaining a nuisance. If the poles were an unlawful obstruction in the street, I think both the city and the street railway company may be held liable; if they were not, I think no cause of action can be sustained upon either ground. This is not a case of a single, isolated pole being located in an improper place. The pole with which the automobile collided was no more dangerous to public travel than any other of these center poles. I think the poles were not an unlawful obstruction in the street. Nor do I think that any changed situation or conditions have arisen since the original location of the poles, so as to make the defendants liable for the collision.

While the act of the Legislature granting the franchise (Laws 1866, c. 479) did not specifically authorize the street railway company to use electric power for operating its railroad, by section 12 of chapter 252 of the Laws of 1884 it was expressly authorized to operate its railroad by any power other than locomotive steam power, which might be consented to by the local authorities and by a majority of the property owners, obtained in accordance with sections 3 and 4 of that act. That such consent was obtained is established beyond dispute, and such I understand to be the holding of the trial court. Thereupon the street railway company had the same right to conduct electric energy in the street for operating its cars as to lay tracks.

Under the city charter the common council has the general control of the streets and is specifically authorized to regulate the use of them. Laws of 1870, c. 519, tit. 3, § 8, subd. 8; City of Buffalo v. Stevenson, 207 N. Y. 258, 100 N. E. 798. In 1890 the common council, assuming to exercise the authority to locate trolley poles, carefully considered the question as to whether it was advisable to place the poles in the center of the street or on the side. The center line plan was adopted as to Niagara street and other sections of the city. Whether or not that plan was specifically adopted by the common council as to North Main street, where the accident occurred, or the poles located in the center of the street by specific direction of that body, is not made to appear by direct proof. However, it is conclusively established that the poles there were located in the center of the street, if not by the express direction, with the consent, of the common council.

In determining whether the poles should be located in the center or on the side of the street, I think the common council was performing

a governmental function and acting in a quasi judicial capacity. If the common council erred in locating the poles in the center, instead of on the side, or permitting that to be done, it was but an error of judgment, for which no legal liability arises, any more than as if the common council had located a row of street lights in the middle of the street. As is well known, public streets are not entirely devoted to public travel. Furthermore, the driveways upon either side of this row of poles seem to have been sufficient for ordinary vehicular travel. At least, so far as the record discloses, no such accident as this had ever happened before. That this accident would not have happened but for the reckless driving is abundantly established by the evidence, and so the jury has found. Against such accidents the city is not required to guard.

I am of the opinion that the question as to whether the side pole construction or the center pole construction would best subserve public interests was fairly within the power delegated by the Legislature to the common council for its determination, and, if so, no action lies for locating the poles in the center, instead of on the side, of the street (Maxmilian v. Mayor, 62 N. Y. 160, 20 Am. Rep. 468; Urquhart v. City of Ogdensburg, 91 N. Y. 67, 43 Am. Rep. 91 note; Young v. Inhabitants of Yarmouth, 75 Mass. [9 Gray] 386), and that no legal liability exists against either the city or the street railway company.

If I am right in this conclusion, it follows that a verdict should have been directed for the city and the street railway company, and the complaint should now be dismissed as to them.

LAMBERT, J. (dissenting). On the evening of April 23, 1912, plaintiff's intestate was riding in an automobile along North Main street in the city of Buffalo. This car was owned by the appellant Windsor Motor Car Company, and was being driven by one Fairman, an employé. At the place of the accident the trolley poles were set through the center of the street, instead of upon each side. The automobile came into collision with one of these poles, causing the death of intestate. This action is brought against the Motor Car Company, the Railway Company, and the city, by the administratrix, and she has had a general verdict against all the appellants.

In so far as the appellant Motor Car Company is concerned, the sole question presented by this appeal is the sufficiency of the evidence to charge that appellant with the negligence of Fairman, the driver. Clearly the evidence justifies the inference that Fairman was negligent in his management of this car. The evidence upon this issue is fully discussed in the opinion of Mr. Justice MERRELL. While such evidence was probably sufficient to require the submission of that issue to the jury, under the doctrine enunciated in McDonald v. Metropolitan Railway Co., 167 N. Y. 66, 60 N. E. 282, yet the verdict as to this appellant must be set aside as against the weight of evidence.

As was pointed out in McCann v. Davison, 145 App. Div. 522, 130 N. Y. Supp. 473, the possession of this car by Fairman upon this occasion would suffice to raise a presumption that Fairman was then engaged in the business of the Windsor Motor Car Company. Had the

proof ended with that presumption, no doubt the jury verdict should stand. Combated as it is by a silent record of any effort of demonstration or sale of the defendant Motor Car Company cars, and by the positive evidence of the treasurer of the Motor Car Company, even though that official be an interested witness, the presumption is insufficient to meet the burden of proof cast upon the plaintiff, as to that fact. McCann v. Davison, supra, presented substantially the same situation as to the weight of such proof compared with the presumption so raised, and, as did the court in that case, I conclude that this verdict, upon that issue and against that appellant, is against the weight of the evidence.

As against the Railway Company and the city, the action was submitted as one in nuisance, rather than in negligence, and the propriety of such submission is the more serious question upon this appeal. By chapter 479 of the Laws of 1866 the Legislature authorized the predecessor of the present companies to construct and operate a street surface railway in this and other streets. By section 12 of chapter 252 of the Laws of 1884 it further gave authority for the operation of this road by any other power than locomotive steam power, which might be consented to by the local authorities and by a majority of the abutting property owners, as provided in such act. By the city charter (Laws of 1870, c. 519, tit. 3, § 8, subd. 8) the general control of the streets of this city and of the use of the same was vested in the common council of the city.

The authorization in the Railway Company (aided by the consent of the city and of the abutting owners) to construct and operate this railway as an electric railway necessarily implied a license to erect in the street, in some location, the poles and structures appurtenant to such a system. This license to erect such structures necessarily involved a choice of location, and such choice of location the Legislature had seen fit to vest in the common council, by virtue of the provision of the city charter above referred to. While this record is silent as to affirmative action by the council in the selection of this particular location chosen, yet we must presume that the city did so act, and that the location adopted was the choice of the common council. This conclusion is compelled by the provision of section 91 of the Railroad Law (chapter 565, Laws of 1890, as amended by Laws 1907, c. 156), as follows:

"Whenever heretofore or hereafter a railroad has been or shall be constructed and put in operation for one year, or the motive power thereof has been or shall be changed and put in operation for a similar length of time, such facts shall be presumptive evidence that the requisite consents of local authorities, property owners and other authority to the construction, maintenance and operation of such railroad or change of motive power have been duly obtained."

That the common council had authority to control the location of these poles, in observance of its conception of a proper location, seems clear. City of Rochester v. Bell Telephone Co., 52 App. Div. 6, 64 N. Y. Supp. 804; Barhite v. Home Telephone Co., 50 App. Div. 26, 63 N. Y. Supp. 659. It is sought, however, to apply to this case the so-

called "governmental function rule," as follows: It is said that jurisdiction over the streets rested primarily with the state, and having been acquired to a limited extent by the city, by virtue of delegated authority from the state, that in its selection of this location for the poles the city acted as a representative of the state, and hence for an error in judgment in making such location no one is liable. The governmental function rule has become firmly ingrafted in our decisions. Maxmilian v. Mayor of New York, 62 N. Y. 160, 20 Am. Rep. 468; Urquhart v. Ogdensburg, 91 N. Y. 70, 43 Am. Rep. 91 note; Lefrois v. County of Monroe, 162 N. Y. 563, 57 N. E. 185, 50 L. R. A. 206; Wilcox v. City of Rochester, 190 N. Y. 137, 82 N. E. 1119, 17 L. R. A. (N. S.) 741, 13 Ann. Cas. 759; Berger v. Solvay, 156 App. Div. 440, 141 N. Y. Supp. 995; Gaines v. City of New York, 156 App. Div. 789, 142 N. Y. Supp. 401. The rule itself lies in no doubt. It is clearly stated in Lansing v. Toolan, 37 Mich. 152, where Cooley, C. J., says:

"In planning a public work a municipal corporation must determine for itself to what extent it will guard against possible accidents. Courts and juries are not to say it shall be punished in damages for not giving to the public more complete protection; for * * * that would be to take the administration of municipal affairs out of the hands to which it has been intrusted by law. What the public have the right to require of them is, that in the construction of their works after the plans are fixed upon, and in their management afterward, due care shall be observed; but negligence is not to be predicated of the plan itself."

From the above cases it will be seen that, in its determination of a proper plan of procedure, the municipality acts in a judicial capacity, and for such acts it is not liable. It further appears, however, that even though the plan selected may be lawful in every particular, and affords no basis for relief to a person injured, yet the municipality and all others having dominion over the structure owe to the traveling public an active duty of so managing, controlling, and safeguarding the structure or improvement, within the limits of reasonable care, as to safeguard against injury therefrom. In such care, management, and control thereof the municipality acts in a ministerial capacity, and may be charged with negligence for its failure to use due care in such particulars. Berger v. Solvay, 156 App. Div. 440, 141 N. Y. Supp. 995; Gaines v. City of New York, 156 App. Div. 789, 142 N. Y. Supp. 401.

In this case, the plaintiff's complaint going only to the choice of location of these poles, and not to any failure to guard or light them as located, the application of the governmental function rule, to the complete exoneration of the city and the railway company, might be permissible, except for the rule laid down by the Court of Appeals in Lambert v. Westchester Electric Railroad Co., 191 N. Y. 248, 83 N. E. 977, and asserted in the cases last above cited. In the Lambert Case, the Railroad Company, with the assent of the municipality, located one of its trolley poles close to a driveway leading from a fire station to the street. Plaintiff was injured while attempting to board a piece of fire apparatus, as it left the station, and which came into collision with this pole, by reason of the close proximity of the pole to the driveway. There the court conceded the lawfulness of the location, but distinctly held that a question in negligence was presented grow-

ing out of the continuation of the pole in that location, after notice of the danger attendant upon such location.

While it is difficult to reconcile this case with many of those above cited, yet, under its authority, we are compelled to hold that a question in negligence is or may be presented by the facts appearing in this record. But this case was submitted as one in nuisance so far as the city and the railway company were concerned. Court and counsel agreed that such was the scope of the complaint, and the charge of the trial court limited the issue to one in nuisance.

Assuming, therefore, that the location adopted was lawful and within the statutory power and authority of the common council to adopt, and the presumption being that it did adopt such location lawfully, there could be no charge of nuisance founded upon such location. The location being lawful, neither the municipality nor the Railway Company could be charged with maintaining a nuisance by adopting it. As was said in Lambert v. Westchester Electric Railroad Co., supra:

"In this case the defendant was authorized by the municipality to locate its trolley poles, and therefore they were not nuisances."

The action having been submitted as against these appellants as one in nuisance, while the liability, if any, is in negligence, we must hold that error to be prejudicial to these defendants. Submitted as an issue in nuisance, the contributory negligence of plaintiff's intestate had no place in the case. Contributory negligence is not an issue in a nuisance action. Recognizing this rule, the trial court did not submit the issue of contributory negligence, so far as the city and the Railway Company were concerned. Following that line of authorities, illustrated by Jefson v. Crosstown Street Railway Company, 72 Misc. Rep. 103, 129 N. Y. Supp. 233, such court did submit the question of reckless driving as a question of proximate cause. This, however, falls far short of submitting the issue of contributory negligence.

The trial court concluded that the contributory negligence of intestate was presented by the facts, for such court submitted that issue as to the Motor Car Company. As was said by the Court of Appeals in Francis v. Gaffey, 211 N. Y. 47, 105 N. E. 96:

"This mistake in treating the action as one for a nuisance was particularly harmful to the defendant, on account of the rule which excludes the consideration of the plaintiff's contributory negligence in cases of nuisance."

In any event, under the recent admonition of the Court of Appeals in Lamphere v. Lang, 213 N. Y. 585, 102 N. E. 82, we cannot permit a recovery upon the theory of nuisance to be substituted for one in negligence, even though the proofs indicate negligence as the proper basis for recovery, rather than nuisance. It is not my intention to hold that the facts disclosed by this record necessarily attribute negligence to the city and the Railway Company. I simply assert that, if there be a liability as against such appellants, the same must be founded in negligence, and not in nuisance.

The judgment and order appealed from should be reversed, and a new trial ordered, with costs to abide the event.