**WRIGHT v. MADDOX et al.    (No. 7026.)***

(Court of Civil Appeals of Texas. Austin. Nov. 3, 1926. Rehearing Denied Nov. 24, 1926.)

**1. Automobiles ⬅⇒242(6)—Plaintiff has burden to show driver of automobile causing injury was servant of defendant.**

Generally, burden of proof is on plaintiff to show that party causing injury with automobile was at time acting within scope of his duties as servant of defendant.

**2. Automobiles ⬅⇒242(6) — When plaintiff shows that automobile driver was defendant's servant, defendant has burden to show facts relieving him of liability.**

When it is shown that defendant owned automobile causing injury, and party using it was in his employ under duties generally as driver, burden on plaintiff to show that party causing injury was acting as servant of defendant has been fully met, and burden is then shifted to defendant to show a state of facts which would relieve him of liability.

**3. Automobiles ⬅⇒193(8)—Driver of automobile causing injury held within scope of authority in getting car and driving it to employer's home.**

Evidence that automobile causing injury belonged to defendant, that driver was in his employ as driver, that his duties required him to attend to repairs, and that he was actually engaged in taking car from repair shop by nearest and most convenient route when injury occurred, *held* to show as matter of law that driver was acting within general scope of authority in getting car and driving it to defendant's house; it being immaterial that he had no specific orders to do so.

**4. Automobiles ⬅⇒193(10)—Master's responsibility held not terminated because automobile driver permitted another to ride contrary to orders.**

Responsibility of owner of automobile for injury *held* not terminated because driver violated orders in permitting another to ride in car.

**5. Automobiles ⬅⇒193(8)—Master's responsibility continues until automobile driver actually diverts from master's service.**

Master's responsibility for acts of driver with automobile continued until driver actually diverted from service of the master.

**6. Automobiles ⬅⇒244(14)—Evidence held to sustain finding of negligence of driver of automobile colliding with parked car.**

In action for injury sustained by plaintiff when parked automobile in which she was sitting was struck by defendant's car, evidence *held* to sustain finding of defendant's negligence.

**7. Automobiles ⬅⇒244(35)—Evidence held to sustain finding of violation of speed ordinances by driver of automobile colliding with parked car.**

In action for injuries sustained by plaintiff when parked automobile in which she was sitting was struck by defendant's car, evidence *held* to sustain finding that defendant violated ordinances relating to speed.

**8. Automobiles ⬅⇒244(37)—Evidence held to sustain finding that automobile driver's violation of speed ordinance was contributing cause of collision with parked car.**

In action for injuries sustained by plaintiff when parked automobile in which she was sitting was struck by defendant's car, evidence *held* to sustain finding that defendant's acts of negligence in violating ordinances as to speed was a contributing cause to injuries.

---

⬅⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error dismissed for want of jurisdiction January 19, 1927.

**9. Trial ⬤⟶350(1)—Each separate ground of recovery supported by pleadings and proof must be submitted in personal injury action.**

In personal injury action, court was required to submit each separate ground for recovery supported by pleadings and proof.

**10. Negligence ⬤⟶119(1)—Plaintiff may recover, if evidence is sufficient to support any one of issues of negligence submitted.**

In personal injury action, that some of grounds of negligence were not supported by evidence *held* not to affect verdict, since, if evidence was sufficient to support any one of findings on issues submitted, plaintiff was entitled to recover, and those upon which evidence was insufficient might be disregarded.

**11. Trial ⬤⟶350(1)—Trial court must frame issues according to what pleadings and evidence raise.**

Trial court must pass upon what issues pleading and evidence raise, and frame issues accordingly.

**12. Automobiles ⬤⟶247—Findings as to speed of automobile at time of collision and short time before held not conflicting.**

In personal injury action arising from collision of automobiles, finding that speed of defendant's automobile was only 10 miles an hour at time of collision *held* not to conflict with finding that speed was 25 miles an hour at street intersection a short time before accident occurred.

**13. Appeal and error ⬤⟶232(1)—Assignment of error on measure of damages in personal injury action held not to require consideration on appeal, in view of objection made.**

Assignment of error on measure of damages in personal injury action *held* not to require consideration on appeal, where only objection made in trial court was for reason stated in an objection relating to an issue which had no bearing on issue of damages.

Appeal from District Court, Dallas County; Royal R. Watkins, Judge.

Suit by Annie Maddox and husband against G. G. Wright. Judgment for plaintiffs, and defendant appeals. Affirmed.

See, also, 286 S. W. 607.

John W. Pope and J. L. Zumwalt, both of Dallas, for appellant.

Miller & Godfrey, of Dallas, for appellees.

McCLENDON, C. J. Suit by Annie Maddox and husband against G. G. Wright for personal injuries resulting from an automobile collision between the car in which Mrs. Maddox was sitting parked at a curbing and a Pierce Arrow belonging to Wright, and being driven by his negro chauffeur, Lemon Bland. Trial to jury. Judgment for plaintiff under special issue verdict.

Appellant has filed thirty-two assignments of error; all of which are insisted upon in his brief. These assignments may be classified under five heads: (1) Those dealing with the overruling of special exceptions to plaintiffs' petition; (2) those dealing with the instructions to the jury in refusing a peremptory instruction, refusing a special issue, and complaining of special issues upon the subject of the liability of appellant for the acts of his chauffeur; (3) those relating to the court's special issues on the subject of negligence; (4) an assignment complaining of improper argument by plaintiffs' counsel; and (5) an assignment complaining of a special issue on the measure of damages.

The four special exceptions are so manifestly without merit that we do not deem it necessary to discuss them.

Under the second class of assignments appellant contends, in the first place, that the evidence is insufficient as a matter of law to support a finding that Lemon Bland at the time of the collision was acting within the scope of his authority, and that appellant, under the undisputed evidence, is not responsible for his acts. The car had been left at a welding shop for repairs, and was later being driven to appellant's home by the chauffeur when the accident happened. Appellant's contentions are that the evidence conclusively shows that the chauffeur had no authority to get the car and drive it home; and, further, that the evidence conclusively shows that at the time of the accident the chauffeur was on a mission of his own, he having picked up a friend whom he had agreed to drive home.

There are a number of assignments relating to the manner in which this issue was submitted to the jury and other assignments questioning the sufficiency of the evidence to support the jury's findings. By the thirty-second assignment appellant complains of the following statement made by appellees' counsel in his closing argument to the jury:

"Gentlemen of the jury, if you answer special issues Nos. 3 and 4 'No,' then this little woman has no case."

The trial court instructed the jury that this argument was improper; but it is contended, nevertheless, that its prejudicial effect was not thereby removed. Special issues Nos. 3 and 4 related to the matter of defendant's liability for the acts of his chauffeur.

We have reached the conclusion that under the evidence appellant was liable as a matter of law for the chauffeur's negligence, and this holding renders immaterial the assignments complaining of the charge in this regard and the assignment complaining of argument addressed alone to this particular phase of the case.

With reference to the liability of appellant for the chauffeur's negligence, the record shows the following: The accident occurred about 6 o'clock in the afternoon of July 3, 1922, on North Walton street, just north of

---

⬤⟶For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Elm street, in Dallas, Tex. Appellant lived in a northeasterly direction from this point on Worth street. Lemon Bland was at that time in the employ of appellant as chauffeur. He had been in his employ continuously for several years and at different times since about 1912. His general duties were to look after appellant's automobiles, of which he had three, a Pierce Arrow, Hudson, and Ford; keep them in order and repair as far as his skill would permit; drive the several cars when directed by appellant or other members of his family; and do such other work around the place as he might be called upon to do. When a car needed repair necessitating its being taken to a shop, it was his duty to report to appellant, and appellant would give him instructions. At noon on the day of the accident, he reported to appellant that the Pierce Arrow needed repairs in reference to a pit cock on the gasoline tank and a brace on the running board; quoting from his testimony:

"Mr. Wright ordered me to take the car down there (to the Southern Welding Company on Elm street). The car was taken down there late in the afternoon, I cannot say just what time it was, of this same day, July 3d. As to how I knew what time to go back after the car, I had to get some more parts for it, and I just left it there. He told me about how long it would take to weld it and get it all fixed up. I was to get a pit cock for the air tank, but I didn't get one. That is what I mean by other parts; the air tank for letting air out the same as street cars have, a pit cock so you could turn it; that is all. I had gone to Ferris & Dunlaps' for it."

We quote the following other extracts from his testimony:

"I received instructions from Mr. Wright to take a Pierce Arrow automobile to have fixed, along in July, 1922. I took the car to have it fixed. I carried it to the Southern Welding Company."

"I had informed Mr. Wright that I needed the air bracket and running board fixed on the car. He told me to take it down there. When I got the car down there, I just left it there. I left it there for them to work on, fix this tank and this bracket. I could not say exactly how long they was in fixing the car; fixing, working on it. I suppose it taken them three or four hours, something like that or more. When they finished that car, I went and got it."

"I was not told which way to bring that car back home. I just went down and got the car. He just told me to leave it down there; just told me to take it down and have it fixed. I took it down and left it, and then went back and got it. I don't know how many times before that Mr. Wright had told me to take that car off and have it fixed."

We quote the following from appellant's testimony:

"He never used any car except through some instruction of me or some member of the family.

In the event that I had an automobile that should go to the shop or garage, he always reported to me anything to be done with the car, and then I gave him instructions, where to take it; positive instructions, for him to take it some place and have it fixed, when he told me what was the matter with it. I always told him where to take it and what to do with it. I remember instructing him to take this car down to the Southern Welding Shop, about 50 feet north of Dundee street. I told him to take it down there and have the bracket fixed, and the pit cock fixed for the air tank. The car was started with air. I told him to have the car fixed and leave it there."

"From the information about what was to be done, I thought it would take two or three or four hours, something like that, maybe longer; didn't know whether he could get it right away or not. I instructed him to leave the car there and come on back home. When I had a car in the garage to be fixed, we had two more cars at home we could use."

"I did not instruct Lemon Bland on the evening of the third of July, 1922, to go get the car where I had instructed him to leave it and bring it home."

"As to whether I ever gave my chauffeur, Lemon Bland, instructions or the right or permission to carry people in my car to their homes, or to deliver people other than my family, he had positive instructions not to ever take anybody in my car."

"As to whether Lemon Bland, my chauffeur, had my permission or had the right by my permission, to use this Pierce-Arrow automobile, or any other car that I had at that time, without my instructions, to do the things that he desired to do with them, he did not; he had instructions, positive instructons, what to do with the car; not to ever use it at all for his benefit or any other way. Whenever he used the car, he always used it under positive instructions."

"I did not authorize or grant the privilege to Lemon Bland on July 3, 1922, to pick up a negro boy by the name of Walter Fish and take him home in my automobile. I did not have any knowledge of that act, if it happened; didn't know anything about it. It was done without my consent or knowledge."

"I had some idea about how long that work would take when I sent him down there. I thought it would take three or four hours; didn't know whether they could get through on it right away. I didn't know how long."

"I did not tell him to go get a pit cock. I told him to go down and have it fixed to the car; the man down there—not him. He was to have the pit cock fixed on the car, and a brace put on the fender, I think it was; my recollection."

"It was when I went home to dinner that I told him to go down with the car. I told him after dinner to take it down there."

About 6 o'clock in the evening Lemon went to the Southern Welding Company, and got the car and started to drive it home. From that point he drove east a short distance to Crowdus street, south on Crowdus one block to Main, east on Main two blocks, where he turned north into South Walton street. Just after he made this turn a negro friend of his, by the name of Walter Fish,

jumped on the running board and asked to be driven home. He lived on College street, and, in order to take him home, Lemon would have had to turn east on Indiana street and come back into Worth street from College instead of proceeding on North Walton street to Worth street. The following diagram shows the relative position of the several points involved:

Mrs. Maddox was seated on the back seat of a Ford car, which was parked at the right curb line of North Walton street, in front of the Star Cash Store. After picking up Walter Fish, Lemon proceeded north on South Walton street, made the S turn crossing Elm, and passed into North Walton street, where the collision occurred under circumstances which will be detailed later.

Both Lemon and Fish agree that the latter jumped on the running board while the car was in motion, and it was never stopped; that Fish asked to be driven by his home, and Lemon agreed to do so, as it was not out of the way.

The above, we think, is the substance of all the testimony which bears upon the issue of appellant's liability for the acts of his chauffeur.

The evidence both of appellant and Lemon clearly shows that it was within the general duties of Lemon to get the car after it had been repaired. The contention of appellant in this regard is that it only became his duty to get the car after he had received specific instructions to that effect from appellant. But we do not think the evidence above quoted can be given that construction. There is no substantial difference between the testimony of appellant and Lemon in this regard. They both agree that Lemon's general duties were to look after the three automobiles. It was his duty to report repairs that he could not make himself and get instructions with reference to having them done. He was specifically instructed to take the car to the welding shop for the specific repairs he had reported, and to leave it there for repair. Appellant testified that he told him to leave it there and come on home, because he had other work for him to do, and he thought it would take several hours to do the work. Lemon obeyed these instructions so far as the record shows; ascertained approximately how long it would take to repair the car; and returned for it at the estimated time. There is nothing in the testimony to show that he violated any of the instructions in so doing. It is clear that he interpreted his orders as meaning that he was to have the car fixed by leaving it at the welding shop for that purpose and return when it was repaired and take it back to appellant's house. There is nothing in the testimony even to intimate that he did not have such authority, unless we should assume from appellant's testimony that Lemon was to get instructions for every move he might make with reference to his duties. We think the evidence will not support a reasonable conclusion other than that Lemon was acting within the general scope of his authority in getting the car and driving it to appellant's house.

In this connection appellant cites the following decisions: Van Cleave v. Walker (Tex. Civ. App.) 210 S. W. 767; Parmele v. Abdo (Tex. Civ. App.) 215 S. W. 369; Rew v. Stoddard (Tex. Civ. App.) 225 S. W. 836; and City Service Co. v. Brown (Tex. Civ. App.) 231 S. W. 140.

The holding in none of these cases either supports appellant's contention or militates against the views we have expressed.

[1] The general rule is that the burden of proof is on the plaintiff to show that the party causing the injury was at the time acting within the scope of his duties as servant of the defendant.

[2, 3] When, however, it is shown that defendant owned the automobile, and the party using it was in his employ under duties generally as driver, this burden has been fully met, and the burden of procedure, as it is sometimes called, is then shifted to defendant to show a state of facts which would relieve him of liability. Studebaker v. Kitts (Tex. Civ. App.) 152 S. W. 464 (writ of error denied); Floral Co. v. Sheridan (Tex. Civ. App.) 245 S. W. 467. In this case the evidence was without conflict that the automobile belonged to defendant; that Lemon was in his employ as driver; that his duties required him to look after it in the way of attending to repairs; and that he was actually engaged in taking the car home from the repair shop by the nearest and most convenient route when the accident happened. The fact that he had no specific orders to do a thing within the general scope of his duties falls short of a showing that he was acting without authority, and solely on his own responsibility.

[4, 5] The contention that Lemon had departed from the service of the master on a mission of his own, or for his friend Walter Fish at the time the accident happened, is, we think, without substantial merit. A glance at the map will demonstrate that the accident occurred at a point on the most direct route to appellant's home. The reason for Lemon's going south from Elm on Crowdus to Main instead of doubling back at Crowdus on Elm is not explained, but we think that is not important. The car he was driving was a very large one, and it may have been more convenient to go a block south to Main than to make the complete turn on Elm. It is not contended, however, that there was any diversion from the route home by turning into Main. The whole theory of appellant on this phase of the case rests upon the proposition that, when Lemon permitted Fish to get into the car, and agreed to turn off later at Indiana street and take him home, he ceased to act for appellant, and departed on a mission either for himself or his friend Fish. It may be conceded that he violated orders in permitting Fish to ride in the car, but that fact did not alter the situation. He was still acting within the general scope of his duties, and the responsibility of the master was not terminated by the mere fact that he exceeded or violated his authority in the manner in which he performed his duty. Railway v. Anderson, 82 Tex. 516, 17 S. W. 1039, 27 Am. St. Rep. 902. Nor is there any substance in the contention that he diverted from his route. We may concede that, if he had turned into Indiana street instead of proceeding on North Walton to Worth, the question of diversion would be presented, but un-

til he actually diverted from the service of the master the latter's responsibility for his acts continued.

Special issues Nos. 5 to 12, inclusive, submit various grounds of negligence upon which the jury found in substance the following: (1) that Lemon was driving at the rate of 10 miles an hour at the time of the collision; (2) that he was driving at 25 miles an hour when crossing Elm at Walton; (3) that he was guilty of negligence generally in the operation of the car, which was a proximate cause of the injuries; (4) that he was guilty of violating a city ordinance in the operation of an automobile "at no speed greater than is reasonable and proper, having regard to the traffic and use of the public street * * * by others, or so as to endanger the life and limb of any person therein," and that this was a proximate cause of the injuries; (5) that he was guilty of negligence in violating a city ordinance requiring him to slacken his speed when turning a corner or approaching a street crossing to not more than three miles an hour, and that this was a proximate cause of the injury; and (6) that he was guilty of negligence in violating a city ordinance limiting the speed to 18 miles an hour, and that this was a proximate cause of the injuries.

We will give in a general way what the testimony shows with reference to Lemon's handling of the car at the time of the accident:

[6-8] Lemon stated that before he reached Main he began blowing his horn, and blew it continuously until he had passed into North Walton street; that he slowed down his car before entering Main to 6 miles an hour; that just as he was about to enter North Walton he met another car coming south that was about in the middle of the street, and that he was crowded by this car into the curb, and forced to collide with the Maddox car. He placed the latter at the corner of Main on North Walton. This testimony as to his rate of speed and how the accident happened is not corroborated by any other witness in the case, the only point of corroboration is with reference to blowing the horn. There were a number of disinterested witnesses, all of whom concur that he was going at a very rapid rate of speed in making the S turn. These witnesses estimate the speed at not less than 25 miles an hour, and some of them place it as high as 35 to 40 miles; most of the witnesses estimated the speed at between 30 and 35 miles an hour. The Maddox car, so all of these witnesses testify, was approximately 75 feet from the north property line of Main on Walton, and was parked parallel against the east curbing, facing north. Walton street was paved with bitulithic at this point, and the distance between the curb lines was approximately 30 feet. While there is some conflict between the witnesses with reference to various details, as would naturally be supposed, they quite generally agree that Lemon's rate of speed was, as stated, somewhere between 25 and 35 miles an hour, and that when he turned into Walton he was met with the situation of a car in front of him, going in the same direction, which he endeavored to pass on the left, which would have thrown him in collision with another car coming south. At the rate of speed he was then going he was thus confronted with the dilemma of colliding either with the car going south or the one going north, or with a turn to the right of the latter. This course he adopted, and that threw him against the Maddox car. The evidence is amply sufficient to support a general finding of negligence, and a finding that he violated each of the city ordinances in question, and that each act of negligence submitted to the jury was a contributing cause to the injuries.

We will not attempt to discuss all of the many contentions which appellant makes with reference to the submission of these issues, but will point out what we think to be the substance of the objections urged.

In the first place, appellant contends that by submitting the various issues too much stress was laid upon appellee's theory of the case. It is also contended that the evidence was not sufficient to support the jury's findings on some of the submitted issues.

[9, 10] There is no merit, we think, in either of these contentions. All of the grounds of negligence submitted were raised by the pleadings and, as we think, clearly by the evidence. It was the duty of the court to submit each separate ground of recovery supported by the pleadings and proof. If we concede for our present purposes that we are in error in holding that some of the grounds of negligence were supported by evidence, nevertheless, that would not affect the verdict. If the evidence was sufficient to support any one of these findings, then appellee was entitled to recover, and those upon which the evidence was insufficient might be disregarded. The fact that some of the grounds submitted were not supported by evidence would not call for reversal on the ground of undue prominence. One of the purposes of the special issue verdict was to prevent reversals, which was often necessary under a general charge by reason of submitting elements of recovery or of defense which did not find support in the testimony.

[11] It is the duty of the trial court, of course, to pass upon what issues the pleadings and evidence raise, and to frame issues accordingly. But we commend as a proper practice the submission of issues to the jury where the trial judge has a substantial doubt of their being thus raised, for the reason that, if the court be in error, the findings may be disregarded, if the judgment can be supported on other grounds. If this rule were not applied, then one of the most ad-

vantageous features of the special issue verdict would be lost. The jury are supposed to determine the facts upon which each issue is submitted, independently of the other issues; and, unless there is something in the record to indicate that the submission of an issue raised by the pleadings, but not supported by the evidence, probably influenced the jury in its finding upon some other issue, the rule of undue prominence should not be applied. That rule, we think, should be limited to a repetition of the same issue under a different form, and not to the submission of separate and distinct issues which the pleadings raise.

[12] Particular stress is laid by appellant upon the proposition that the violation of the ordinance requiring speed to be reduced when turning a corner or crossing a street to 3 miles an hour could not be the proximate cause of the accident; and the further contention that the finding that the speed was only 10 miles an hour at the time of the collision was directly in conflict with some of the other findings, it being contended in this regard that the jury's verdict is manifestly against the evidence, and conflicting, and therefore should not be permitted to stand. None of these contentions, we think, is sound. The finding that the speed was only 10 miles an hour at the time of the collision unquestionably, when taken in connection with the finding that the speed was 25 miles an hour at the Elm street crossing, is clearly a finding that the speed of 10 miles was at the actual point of contact, or when the collision occurred. There is no particular reason why the speed at this point should have been submitted to the jury. Whether the speed, either as violating an ordinance or as being generally negligent under the circumstances, was a proximate cause was not determined by the speed at the exact point of contact. The real question involved was whether the speed submitted as negligence contributed to the collision, and we think clearly under the testimony the violation of the intersection ordinance could be found as such proximate cause. The purpose of the ordinance was unquestionably to prevent accidents. If instead of making the S turn at 25 miles an hour, as the jury found, the speed had been reduced to 3 miles an hour, it is hardly probable that the accident would have happened at all. The conclusion to be drawn from the evidence of a number of disinterested eyewitnesses is that in making this S turn at the rate of speed he did Lemon created a situation which resulted in the collision. Under the jury's finding he had at the time of the collision reduced that speed to 10 miles an hour, and the evidence clearly shows that he made every effort to stop the car after he found himself in a perilous position. Under the evidence we think there is no inconsistency whatever in the jury's findings, and we are clear in the view that the finding of negligence as a proximate cause of the injuries is supported under some if not all of the findings.

[13] The remaining assignment of error complains of the special issue upon the measure of damages. There are quite a number of objections to this charge in the brief, but none of them were urged in the trial court, as our practice statutes require. The only objection made in the trial court was "for the same reasons and grounds as stated in his objections and exceptions to the submission of special issue No. 15." That issue relates to one of the grounds of negligence submitted to the jury, and the objections and exceptions urged thereto have no bearing whatever upon the special issue in question. For this reason none of the objections urged in appellant's brief can be considered.

We find no reversible error in the trial court's judgment, and it is therefore affirmed.

Affirmed.