FRIEND–ROWE MOTOR CO. et al. v. RICCI et al. (No. 1480.) *

Court of Civil Appeals of Texas. Beaumont. April 4, 1927.

Rehearing Denied April 13, 1927.

1. Master and servant ☞305—Master is responsible for servant's acts in course of employment, though servant may exceed authority or disobey instructions.

Master is responsible for the acts of his servant, committed in the course of his em-

ployment or in the line of his duty with a view of furtherance of his master's business, and not for a purpose personal to himself, although in committing the act servant may exceed his authority, or even disobey his instructions.

2. Witnesses ☞409—Jury held not bound to accept testimony as true, where contradicted.

In suit for injuries received in automobile accident, caused by employee of defendant, jury held not bound to accept as true testimony that employees were never to use the employer's automobiles for private purposes, or that the employee causing the accident was attempting to sell a car for his employer, where there was evidence which contradicted such testimony.

3. Master and servant ☞332(2)—Whether garage manager driving employer's automobile was within scope of employment held for jury.

In action against garage owner for personal injuries, caused by negligence of manager and employee while he was driving from his home to the office, whether manager was engaged within the scope of his employment at the time of the accident held for jury, even if such use of automobile by him was contrary to rule of owner.

4. Master and servant ☞301(6)—Principle of respondeat superior applies to employee using employer's vehicle for own errands, with employer's permission.

Where an employee within the course of his employment is permitted to use his employer's vehicle to facilitate the performance of necessary errands of his own, he retains the status of employee while he is performing such errands, and the principle of respondeat superior applies.

Appeal from District Court, Jefferson County; J. D. Campbell, Judge.

Suit by Salvatore Ricci and another by their next friend, S. D. Marino, against the Friend-Rowe Motor Company, A. W. Friend, doing business under the name of the Friend Motor Company, and others. From a judgment in favor of plaintiffs against A. W. Friend, he appeals. Affirmed.

Morris, Sewall & Morris, of Houston, for appellant.

Howth, Adams & Hart, of Beaumont, for appellees.

O'QUINN, J. The following statement of the nature and result of the suit is taken from appellants' brief:

"By their second amended original petition, filed in the district court of Jefferson county on April 23, 1926, Salvatore Ricci and Ernest Ricci, minors, suing by S. D. Marino, their next friend, sued Friend-Rowe Motor Company, Friend Motor Company, A. W. Friend, doing business under the name of Friend Motor Company, and W. S. Siler, seeking to recover damages on account of the death of their father, Joseph N. Ricci, who was killed in an automobile accident on December 24, 1924, in the city of Beaumont, in a

collision between two automobiles, one of which cars was owned and operated by W. S. Siler, and the other being owned by A. W. Friend, and at the time of the collision in question was being driven by one R. B. English. Various grounds of negligence against all of the defendants were alleged, plaintiffs praying for judgment for $35,-000.

"Defendants A. W. Friend, Friend Motor Company, and Friend-Rowe Motor Company in due course filed their answer, consisting, among other pleas, of a general demurrer and a general denial.

"The case was tried before a jury, and upon the answers of the jury to the special issues submitted, on April 5, 1926, the court rendered judgment in favor of plaintiffs against A. W. Friend for the sum of $10,500, apportioned between the plaintiffs as follows: To Salvatore Ricci, $4,725; to Ernest Ricci, $5,775. The jury found that W. S. Siler was not guilty of negligence charged against him, and judgment was rendered in his favor.

"The court found, and so declared in the judgment, that Friend-Rowe Motor Company had gone out of business long before the accident occurred, and that there was no evidence showing any liability on its part; and that A. W. Friend was the sole owner of Friend Motor Company, and judgment was rendered in favor of Friend-Rowe Motor Company."

A. W. Friend filed his motion for a new trial, which was overruled, and he brings this appeal.

At the conclusion of the evidence, appellant requested a peremptory instruction in his favor, which was denied. The request for the peremptory instruction was based upon the contention of appellant that there was no evidence upon which the jury could legitimately find that English, as an employee of Friend, was acting within the scope of his employment and in the furtherance of his employer's business at the time the accident occurred.

Appellant presents 9 propositions, but they will all be considered together, as they present the same question—that the evidence, as a matter of law, failed to make out such a case as entitled appellee to go to the jury, and hence the court erred in refusing to direct a peremptory verdict for appellant.

No question is made of the finding of the jury, except the one contention as to the jury's finding in answer to special issue No. 1, that English was acting in the course of his employment and in the furtherance of Friend's automobile business at the time of the accident.

Friend, owner of the Friend Motor Company, did not reside in Texas. He resided in Arkansas, but made frequent visits to Beaumont looking after his business, staying from 5 to 8 days at a time. R. B. English was in full charge of the business for Friend, as manager. The entire business was in his charge and under his control. He hired the other employees, paid them their wages, bought cars from the factory, passed on the value of secondhand cars traded in, and ran the business generally. They were selling Willys-Knight and Overland automobiles.

There was a sign posted in the shop. It read:

"Notice to Employees. This is to notify you that all cars must be in the shop by 6 o'clock p. m., unless special arrangements have been made, and in which case they must be in before 9 o'clock p. m. [Signed] Friend-Rowe Motor Company, by R. B. English, Manager."

Friend testified that it was understood, when English entered into the employment of the Friend Motor Company and took charge of the business, that no employee was to use any of the Friend Motor Company's cars for his personal use; that at the time he employed English, he (English) had a car of his own, and that it was understood that he was to use that for his personal use, and if English or any other of the employees used any of the company's cars for their private use, he did not know of it; that he did not know that English had sold his car until after the accident; and that it was against the rules of the company for employees to use the company cars for any purpose other than company business.

English admitted that he had violated the rule against employees using cars for other than company business, and that he used Friend's cars for his (English's) private use and convenience, principally in going from the office to his home and back in conducting the company's business; that he took the car in which he was driving at the time the accident occurred out of the office on the evening before the accident, kept it in his garage all night, and was on his way returning to the office the next morning when Ricci was killed. He had sold his car some months before. He owned several cars while acting as manager for Friend Motor Company—would buy a car, keep it a while, sell it, and buy another. He did not own any car at the time of the accident. He lived some 20 blocks from the office. He said:

"I never consulted any one whenever I wanted to use a car. I did as I pleased down there, as far as business was concerned. I was the boss man and head man down there in the place of business, and all of those cars were exclusively under my care and control"

He said that competition in the sale of cars was very keen, and that he was very anxious to sell a car just at any time he could. He said:

"There is a great many different ways of finding out who wanted to buy a car. I was always on the lookout for a prospective purchaser of an automobile, whether it was a new or secondhand car. I was always on the lookout for a purchaser of an automobile, whether it was day or night, or on duty or off duty."

He further testified:

"I suppose that if I were driving from my home to my place of business in the morning, or

was driving from my place of business to my home in the evening, that I would try to sell a car to a customer if I could, but on this particular occasion when the accident happened, I was not trying to sell a car; neither was I trying to demonstrate one. It is a hard question for me to answer as to whether or not I was always on the lookout for a customer. Of course, I would sell a car whenever I could, but I don't say that I was on duty and demonstrating a car every time I rode down the street. I don't think I would overlook the chance of selling an automobile to a customer, even though I were not at my place of business. I suppose I would sell a car at any hour of the day or night that I could. * * * I knew that Mr. Friend wanted me to sell automobiles—that was the main thing. That was my business to sell all the automobiles that I could. It was also my business to sell a car whenever I had an opportunity to sell one; I was also on the lookout for a prospect. Anybody that did not have an automobile, and I thought that maybe they had money enough to pay for one, either cash, or on the installment plan, was a prospect. Me and the rest of the salesmen considered every person who did not have an automobile, and who might be able to pay for one, either cash or on the installment plan, as a prospect."

He testified that he was not using the car on the morning of the accident for demonstration purposes, but was using it for his own private purpose and benefit; that he was not trying to sell it or any car. He said that he was at all times looking out for prospective purchasers of cars in any way that he could, and in various ways got in touch with prospective purchasers. On the morning of the accident, he was on his way from his home to his office, and picked up Miss Lily Singletary, who had started to her work down town and was waiting on a corner for a street car. He had noticed her before going to town on a street car and had frequently seen her down town walking. She resided in the sixteenth block, and English in the twentieth block on the same street. He testified that he did not try to sell her a car on that morning, but that he did afterwards try to sell her a car. He said that:

"I found out from her that morning where she lived. I asked her where she lived and she told me. I also found out that she was a working girl, because she told me that she was going to Longe's Coffee Company, and that she worked there. I picked her up that morning and started to take her to her work. The idea of selling her a car that morning did not enter my mind. The idea of trying to sell her a car entered my mind some three or four months ago."

Miss Singletary testified that she had started to town to her work on the morning of the accident, and that she was waiting at the street corner for a street car, and English came along in an automobile and picked her up. She said that she was late that morning. While on their way to town, the accident occurred and Ricci was killed. She lived with her parents, and none of them owned a car. She said that English did not try to sell her a car that morning, but she admitted that she had told Mr. Hart, one of the attorneys for appellees, shortly after the accident, that English did try to sell her a car on that occasion, but she said that she was mistaken as to the time; that it was after the accident that English tried to sell her the car.

B. M. Stark, a car salesman for Friend Motor Company, testified that it was generally understood that, when a car was taken out of the shop, it was for business purposes only, and that cars were supposed not to be kept out longer than was necessary for business purposes, but that when one was kept out longer than it should have been, English never did say anything about it to the person keeping it out. He said that he, Stark, took cars and went off with them without reporting to anybody or getting permission from anybody. He said that he did not have to get English's consent—that he had permission to use the cars whenever he wanted to. He testified:

"During the time that I worked down there, I saw Mr. English driving and using Mr. Friend's cars. He drove them the biggest part of the time. He did not have any special car that he used all the time; he just used whichever car that he saw fit to. * * * Mr. English was usually at the place of business between 7:30 and 8 o'clock in the morning. Mr. English usually come down to the place of business around 7:30 or 8 o'clock and he was usually around the place of business the biggest part of the time; I have come back by the place of business around 10 o'clock at night and have seen Mr. English in there working. I have seen Mr. English leave Friend's place of business at night. Sometimes when he left there he left on foot, and other times he left in an automobile. When he would leave in a car, I suppose the car belonged to Mr. Friend. He got the car that he used out of the place of business; he got the car out of Mr. Friend's place of business. Sometimes he used a secondhand car, and sometimes he used a new car; sometimes he drove an open car, and at other times a closed car; he used first one car and then another—he did not have any special car that he used all the time; he just used any of them that he wanted to, I suppose. * * * I never did inspect the cars that Mr. English drove to see whether they were his or Mr. Friend's cars. I have seen Mr. English drive different cars out of that place at different times. I have seen him take out different cars; I have seen him take out a Willys-Knight roadster; I have seen him take out an Overland touring car; I have seen him take out an Overland sedan; and I have seen him take out a Willys-Knight touring car and a Willys-Knight sedan. I saw him take out first one, and then another. I don't suppose he bought that many cars himself; I suppose those cars belonged to the Friend-Rowe Motor Company, and not to English. I have seen him drive both secondhand cars and new cars also; he drove both kinds, new and secondhand cars. The Friend-Rowe Motor Company sold both new and secondhand cars. I was working there as a sales-

man during the time I was around there. When English would leave the shop in those different cars, I don't know whether he was going to demonstrate them or was using them for his own private use; after he left the shop I don't know what he did. He did not have anybody at the shop to account to for anything, that I know of."

F. J. Gober was a salesman for the Friend Motor Company, under English. He testified:

"I was a salesman for the company; I was selling used cars. I had charge of the used cars that I was selling; I used those cars whenever I wanted to; I used them to demonstrate with. I was supposed to use those cars to demonstrate them to my prospective purchasers."

A. T. Katzler was a mechanic in the employ of Friend, under English. He testified that he was working for the Friend Motor Company at the time Ricci was killed; that English was driving a Willys-Knight coupé at the time that belonged to Friend; that English took the car out of the shop the evening before the accident; that before that time English had taken the cars out of the shop on evenings and kept them all night; that he, Katzler, used cars without permission from English. He said:

"I have seen him take them out a number of times. He was in and out all the time with the cars. There was times that he took cars out the evening before and didn't bring them back until the next morning."

R. C. Rowe, formerly a partner with Friend in the automobile business, testified that while English was Friend's general manager and was running the business Friend would come to Beaumont frequently, and that while Friend was there English would take cars out of the place of business in the evening and keep them out all night and return them the next morning; that he never heard Friend object to the using of the cars; that English did not observe the rule relating to using the company's cars for personal use.

A. L. Anglin, who was a former manager for Friend Motor Company before English became manager, testified that he was the one that put up the sign in the place of business relating to the use of cars by employees, and that it did not apply to the manager. He said:

"This sign and rules that we have been talking about was put up in the shop by me. I put the signs up myself. I put those signs up in the shop and around the place. The signs I have reference to are the ones relating to the use of automobiles. I put those signs up to make the salesmen quit running around at night and using those cars for their own pleasure. These signs were put up there for the benefit of the salesmen. Those signs did not apply to the managers altogether."

The statement of facts contains more than 100 pages. Numerous witnesses testified both as to the manner of conducting the business and the circumstances of the accident. We think the above is a sufficient statement of the testimony bearing upon the issue of appellant's liability for the acts of his manager, English.

[1] We think the judgment should be affirmed. The law on this subject is well settled in this state. The rule is that the master is responsible for the acts of his servant, done within the scope of his agency; that is, in the course of his employment or in the line of his duty with a view of furtherance of his master's business, and not done for a purpose personal to himself. The fact that the servant in committing the act may have exceeded his authority, or even disobeyed his instructions does not alter the rule. Railway v. Anderson, 82 Tex. 516, 520, 17 S. W. 1039, 27 Am. St. Rep. 902; Wright v. Maddox (Tex. Civ. App.) 288 S. W. 564.

[2, 3] While it is true that both Friend and English testified that the employees of Friend Motor Company were never to take or to use the company's cars for their own private purposes, the jury was not bound to accept this testimony as true. There was ample evidence, we think, from which they might find that this rule was not observed or enforced, but, to the contrary, was habitually ignored without protest, and we think that so far as English, who stood in Friend's shoes in the conduct of the business, was concerned, it is practically without dispute that he habitually disregarded the rule, if it applied to him, and used Friend's cars for his convenience in going from the office and returning thereto, thus saving time and giving greater service and attention to the management of his master's business. We think the jury could also find from the facts and circumstances in evidence that English's use of the cars was known and assented to by Friend. Whether English was acting within the scope of his employment and in the interest of his employer at the time of the accident was a question of fact for the jury. He was in appellant's employ, and was driving appellant's car with the knowledge and consent, we think, of Friend, and for the purpose of aiding in the management of Friend's business. The evidence showed that English had habitually used the company's cars, both used cars and new cars, as he pleased, for his convenience and in the conduct of the business; that Friend was present frequently from 5 to 8 days, and that English at these times was so using the company's cars; that the rule against the use of cars by employees did not apply to the manager, thus permitting the jury to infer that the use of cars by English was in line with his duties and in the discharge of his master's business; that at all times, whether on duty or off duty, English was on the lookout for prospective purchasers of cars and availing himself of every opportunity to get in touch with and to locate

prospective purchasers; and, further, that Miss Singletary, soon after the accident, admitted to Hart, an attorney for appellees, that on the morning of the accident English tried to sell her a car, though she denied on the trial that it was on that morning and said that she was mistaken as to the time when she told Hart what she did, and that it was after the accident when English, in fact, did try to sell her a car. The jury had the right to weigh this testimony and to conclude from all the circumstances that she was telling the truth when she told Hart that English did try to sell her a car on that morning, which, if true, showed, unquestionably, that he was actually, at the very time of the accident, engaged in the furtherance of his master's business. We think that, from all the facts and circumstances shown, the jury could legitimately infer and conclude that English was using the car in line with his employment and as an aid in the management of Friend's business, and that he was, at the time of the accident, endeavoring to promote his master's business by seeking to make a sale of a car. Pierce-Fordice Oil Association v. Brading (Tex. Civ. App.) 212 S. W. 707; Sina v. Carlson, 120 Minn. 283, 139 N. W. 601; Whimster v. Holmes, 177 Mo. App. 130, 164 S. W. 238; Stern v. Railway Co., 167 App. Div. 503, 153 N. Y. S. 520; Wright v. Maddox (Tex. Civ. App.) 288 S. W. 560; Jones v. Weigand, 134 App. Div. 644, 119 N. Y. S. 441.

We further believe that the verdict of the jury and judgment based thereon may be sustained, even though the rule against employees using company cars applied to English, and that using the car, on the occasion in question, was for his personal convenience in going to and returning from his home. The evidence shows that he habitually used company cars for this purpose. We think there is ample ground for the inference that he did so with Friend's knowledge and consent. He was Friend's employee. His time belonged to his employer. He was using his employer's car for a purpose, we think, shown to have been consented to by his employer, in order to facilitate a matter of his own, and in facilitating which he was, in fact, facilitating his employer's business as well in the conservation of time, enabling him to give more time to the master's service and more prompt attention to the business generally, and therefore the purpose of the use of the car was not a private one in which the master had no interest.

[4] The rule is well established that, if, within the course of his employment, an employee is permitted to use his employer's vehicle to facilitate the performance of necessary errands of his own, he does not, while on this errand, cease to be an employee, but is still an employee, and the legal principle of respondeat superior applies. This rule has been frequently applied to cases where railroad employees have been permitted to use an engine in going to and returning from meals or to and from work, and, generally, to the case of employees who are permitted to use the employer's instrumentalities for such purposes.

We shall not discuss the numerous cases cited by appellant, which, it is contended, support his theory of the case, nor shall we quote from the decisions cited by us, but will say that the question of whether English was, at the time of the accident, acting in the furtherance of his master's business was raised by the evidence and found by the jury in favor of appellees, and we think the inference which the jury could legitimately draw from the facts and circumstances are sufficient to sustain the verdict and judgment, and that the authorities we have cited sustain this view. It follows that the judgment should be affirmed, and it is so ordered.

Affirmed.