### WILHOIT et al. v. IVERSON TOOL CO.
#### No. 3247.

Court of Civil Appeals of Texas. Beaumont.
Aug. 9, 1938.

Rehearing Denied Sept. 20, 1938.

Jones & Jones, of Marshall, for appellant.

Bibb & Bibb, of Marshall, for appellee.

COMBS, Justice.

This appeal is from the District Court of Gregg County, and is before us on transfer by the Supreme Court.

This suit was instituted by appellant, Nellie Wilhoit, a minor, by next friend, to recover damages for personal injuries sustained in a collision between the automobile which she was driving and an automobile driven by W. A. Clarence. She named W. A. Clarence and the Iverson Tool Company as defendants, alleging that Clarence was an employee of the Iverson Tool Company and acting within the scope of his employment at the time of the accident. A trial to a jury resulted in a verdict convicting W. A. Clarence of the various acts of negligence alleged and fixing damages in the amount of $5,750. The jury also found that the relation of employer and vice-principal existed between Clarence and the Iverson Tool Company in conducting the business of the company; that Clarence was acting in the course of his employment for the Iverson Tool Company at the time of the collision. The jury found for the plaintiff on all issues of contributory negligence. The trial court's judgment was in favor of the plaintiff and against W. A. Clarence for the damages assessed, but granted the motion of the defendant, Iverson Tool Company, for judgment non obstante veredicto that plaintiff take nothing as against it. W. A. Clarence has not appealed. The plaintiff has prosecuted this appeal from the judgment of the trial court denying her recovery as against the Iverson Tool Company. As we view the record the decisive question presented by the appeal, and the only one which need be discussed, is whether or not there was evidence to support the jury's finding that W. A. Clarence was acting within the scope of his employment at the time of the accident. The only testimony on the point was by Mr. Clarence himself, so that the decision rests upon the legal interpretation to be given his testimony.

The Iverson Tool Company conducts an oil field supply business at Kilgore, Texas. At the time of the accident Mr. Clarence was branch manager of the store, which included the duties of an outside salesman, and which position he had held with the company for several years. His territory as branch manager and outside salesman covered the East Texas oil fields in Smith, Rusk, Gregg and Upshur Counties. The store at Kilgore was the only store which the Iverson Tool ·Company had in that area. Mr. Clarence had authority to hire and fire men, and attend to the various details of the Iverson Tool Company's business in that territory. There was an employee who had charge of the store, kept the books, took care of the stock and waited on the trade which came to the store. Clarence's business seemed to have been on the outside, as outside salesman and contact man. He testified:

"Q. You are more inclined to get to your friends than enemies? A. I suppose so.

"Q. In the advancement of your company's business, take for example they were selling a piece of machinery at exactly the same price as your competitor across the street. ·If a friend happens to be a friend of yours and don't like the competitor across the street, that would be good business for your company? A. They require me to sell the stuff, how I sell it, it's my business.

"Q. Do you know you can sell more of it if you are friendly with these people than if you are not? A. If you are friendly with a fellow and he is loose and he is not tied up, you have a chance. You have an equal chance.

"Q. Your company recognizes that to such an extent they provide you with entertainment expenses? A. Yes, sir, I have an expense account.

"Q. I mean by that, you send in accounts for entertainment and it is O. K. with the company? A. Yes, sir.

"Q. They pay those items off like your other expense items? A. Yes, sir.

"Q. And look to you to engage in certain entertainment to the crowd to advance business? A. No, they don't look for that. I expect it would be all right with them if I didn't never send any in.

"Q. But when you send one in for entertainment, they pay it? A. Yes, sir, such as food.

"Q. They take the bone, so to speak, to get the steak? A. Yes, sir, they spend money to get money.

"Q. And that is the way they spend it, want you to be on good terms with the purchaser? A. Yes, sir.

"Q. They urge you to contact purchasers generally and otherwise? A. No, sir, they don't urge me, we make out a report and they look at it every 30 days and if

you didn't make some showing, they would buy you out, as I said awhile ago.

"Q. In the business itself, when you do entertain, they let you do that? A. They allow me an expense account.

"Q. And on that is an entertainment item? A. Yes."

He testified that the company furnished him an automobile for use in his business; that he kept the car and was privileged to use it in his own private affairs as well as for the company's business; that the Iverson Tool Company paid his gasoline expense, both for a private automobile which he owned and the company car which he used, and kept the company car in repair. On the occasion in question, he testified that after supper his wife went to the picture show; that after she was gone he read a little while and then decided about 9 o'clock that he would go down in town and loaf until she came out of the picture show. He got into the company automobile and drove down in town and parked it near where his wife's automobile was parked. He then stopped a few minutes at a drug store and went on to the Kilgore Hotel. While there he met two friends, Sam Cook and Frank King. Mr. Cook was owner of a bunch of producing oil wells, about 28, and Mr. King was the owner of the Francis Oil Company, which owned a drilling rig and four wells. He testified that he loafed around with King and Cook. He didn't try to sell them anything or talk business with them, but merely loafed around with them a short time. He testified:

"Q. You testified on your deposition when you go places like this, you like for them to say, 'There is Mr. Clarence with the Iverson Tool Company'? A. Yes, sir, that is all right.

"Q. And you testified that if you didn't mix around like that, in hotels and other places, they are liable to say, 'What has happened to the Iverson people?' A. Yes, sir, I testified to that.

"Q. And that is true? A. Yes, sir.

"Q.. Your have to be known and associate with the fellows you sell, or you don't sell them anything? A. Well, yes, sir.

"Q. In some cases it helps? A. Yes, sir, I think so."

Between 10 and 11 o'clock his wife came out of the picture show and he told her to drive on ahead and he would follow her in his car. He got in his car and started to his home and while on the way the collision in which Miss Wilhoit' was injured occurred. On cross examination by counsel for the Iverson Tool Company, he said that he didn't have any appointment with King and Cook, or anyone else down at the Kilgore Hotel, but went down there to loaf around and simply met up with them. He said he didn't talk to anyone on that evening, either at the drug store or hotel about making any sales for the Iverson Tool Company. He further testified that he considered his hour of regular work over at six o'clock. He testified that he wasn't out on a mission for his company but was just loafing around, a mission of his own. It is plain from his testimony, however, that he would have made a sale to King or Cook that night or to anyone else, had the occasion arose. He considered such mixing around with people in the oil producing business necessary to the success of the business of the Iverson Tool Company.

## Opinion.

It is our conclusion that the evidence as a whole, pertinent parts of which we have summarized above, supported the jury's finding that Clarence was acting within the scope of his employment with the Iverson Tool Company at the time of the collision in question, and that the defendant, Iverson Tool Company, was therefore liable. The principles of law involved are plain, simple and thoroughly established. It is, of course, true, as contended by appellee, Iverson Tool Company, that the master is not liable for injuries occasioned by acts of the employee occurring at a time when the employee is engaged on a purely personal mission for himself, even though he may at the time be using the master's automobile, either with or without the master's consent. That principle is stated in Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 5, § 3028, p. 172, as follows: "The master is not liable for injuries caused by the negligence of the servant in the operation of the master's automobile or that of the servant, for purposes of the servant, after business hours, or while the servant is acting on his own time. If the servant is driving solely for his own pleasure, it is immaterial, as far as the liability of the master is concerned, whether he has the master's permission to drive one of his machines or does not have such permission."

But when the servant is acting within the scope of his employment and in furtherance of the master's business at the time of the injury, the master is, of course, liable. Our Supreme Court, speaking through an opinion by the late Judge Ryan of the Commission of Appeals, in Texas Power & Light Co. v. Denson, 125 Tex. 383, 81 S.W.2d 36, thus stated the general rule of liability [page 38]: "The rule in this state is that if the act complained of is done within the scope of the general authority of the servant, in furtherance of the master's business and for the accomplishment of the object for which the servant is employed, the master is liable."

Many authorities might be cited in which the rule of liability of the master for the acts of the servant is set forth, but it is not necessary. The only difficulty here presented is in determining whether or not the facts of this case bring it within the rule of the master's liability.

To our way of thinking they clearly did. Mr. Clarence's employment was a general one. He was largely his own boss. He regulated his own hours of work. One of the main duties of his employment was to cultivate the acquaintance and friendship of men engaged in the oil producing business. They were the potential customers of his employer's oil field supply business. The employer furnished Clarence an automobile and allowed him an expense account with which to entertain these prospective customers, and although he made no sales to Cook or King at the hotel on the evening in question, the conclusion, we think, is inescapable that he would have made sales to them had they offered to buy. His visiting with them around the hotel was unquestionably in the general scope of the duties he was employed to perform. The building of good will for the master's business, and interesting prospective customers, was in furtherance of the master's business. Ackerson v. Jennings Co., 107 Conn. 393, 140 A. 760, 56 A.L.R. 1127; Friend-Rowe Motor Co. v. Ricci, Tex.Civ.App., 293 S.W. 851, writ dismissed. The implied powers of an agent are particularly broad in the case of one acting as a general agent or manager, since such position presupposes a degree of confidence and investiture with liberal powers for the exercise of judgment and discretion in transactions within the general scope of the business intrusted to him. Ackerson v. Jennings Co., su-

pra. And where the servant is permitted, at his own discretion, to mix his own private affairs with those of the employer, as in the instant case, the courts will not undertake to make nice distinctions and fix with precision the line that separates the act of the servant from the act of the individual, where it appears that the act in question occurred at a time when the servant was engaged in the performance or furtherance of matters coming within the general scope of his employment. Weatherford, etc., Railway Co. v. Crutcher, Tex. Civ.App., 141 S.W. 137; Gulf Refining Co. v. Railway Co., Tex.Civ.App., 261 S.W. 169; Davis v. Produce & Brokerage Co., Tex.Civ.App., 261 S.W. 401; Sherman & Redfield, Vol. 1, page 361. We think Clarence was clearly acting within the implied, if not the express, general powers of his employment and in furtherance of the business of the Iverson Tool Company. Such fact clearly distinguishes this case from such cases as Texas News Co. v. Lake, Tex.Civ.App., 58 S.W.2d 1044 and Reynolds v. Texas Iron Works Sales Corp., Tex.Civ.App., 72 S.W.2d 299, in which cases the evidence clearly established that the driver of the automobile in question was on a purely personal mission of his own. In those cases he was neither doing any specific thing for his employer nor performing any act which lay within the general scope of his employment. Sherman & Redfield, cited supra, state the rule that: "Where a servant is allowed by his master to combine his own business with that of the master, or even to attend to both at substantially the same time, no nice inquiry will be made as to which business the servant was actually engaged in when a third person was injured by his negligence; but the master will be held responsible, unless it clearly appears that the servant could not have been, directly or indirectly, serving his master in the act, the negligent performance of which caused the injury."

Clarence's testimony to the effect that he was engaged in a mission purely personal to himself was a mere legal conclusion and is entitled to no weight. His status at the time of the accident must be determined by the legal effect of the facts and circumstances shown, and not from his opinion as to their legal effect.

It follows from what we have said that the trial court in refusing to enter judgment for appellant against the Iverson

Tool Company, on the verdict of the jury, was in error. Therefore, the judgment of the trial court is reversed and judgment here rendered for appellant.

Reversed and rendered.