

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00048-CV

———————————————

CHRISTOPHER PAUL GROGAN, Appellant

V.

ELITE METAL FABRICATORS, INC., Appellee

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV18-01-022

Before Sudderth, C.J.; Meier and Kerr, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

### I.  Introduction

After their motorcycles collided outside of Sturgis, South Dakota, Appellant Christopher Paul Grogan sued Jay Darter and Appellee Elite Metal Fabricators, Inc. for his injuries,[1] alleging that Elite was vicariously liable because Darter was Elite's employee.  Darter, the majority shareholder and president of the closely held corporation, admitted that he had caused the collision,[2] but Elite disputed the vicarious liability claim, arguing that Darter had been on vacation when the collision occurred.  Elite filed a traditional and no-evidence motion for summary judgment, which the trial court granted.  In four issues, Grogan appeals.  We affirm.

### II.  Background

In April 2016, Grogan sued Darter for negligence, negligence per se, and gross negligence with regard to the August 2, 2014 collision and extended his claims to Elite

---

[1]Grogan alleged in his original petition that the collision resulted in "the loss of his left leg, a broken pelvis, broken teeth, lacerations, abrasions, and loss of hearing," and in his response to Elite's motion for summary judgment, he asserted that his past medical expenses had totaled $627,595.57.

[2]Darter pleaded guilty to the charges of vehicular battery and reckless driving and received probation, the terms and conditions of which included restitution costs of $488,836.61 for the three individuals—including Grogan—who were injured, offset by any recovery by them due to insurance coverage, and a letter of apology to Grogan and the other two injured individuals.  Darter also served 50 days' confinement as a result of his guilty plea.  During his deposition, Darter accepted full responsibility for the collision and said that Grogan did nothing to bring about or contribute to the collision.

through respondeat superior. The parties' first scheduling conference was set for August 30, 2016, at which deadlines for the completion of discovery were to be set. Six months later, the trial court entered an agreed amended order for a second scheduling conference, ordering all discovery to be completed by July 28, 2017. The day before that deadline, the parties filed a rule 11 agreement in which they agreed to further extend the discovery period and reschedule the second scheduling conference into November 2017.[3]

On October 6, 2017, Elite filed its traditional and no-evidence motion for summary judgment. In the traditional portion of its motion, Elite argued Darter's tortious conduct was not committed within the scope of his general authority for Elite and that Darter was on vacation, not acting in furtherance of Elite's business or to accomplish the objective for which he was hired while in South Dakota in that his responsibilities for the company did not involve attending the Sturgis Motorcycle Rally, drinking alcohol, or riding his personal motorcycle. Elite further argued that Darter and his personal health insurance company paid his medical bills with regard to

---

[3]During the pendency of the lawsuit, Grogan filed more than one motion to compel, seeking electronically stored information on Darter's and Elite's finances, but did not press the trial court for a ruling. It also does not appear that Grogan filed a motion for continuance of the summary judgment proceeding. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 647 (Tex. 1996) ("When a party contends that it has not had an adequate opportunity for discovery before a summary judgment hearing, it must file either an affidavit explaining the need for further discovery or a verified motion for continuance.").

3

the injuries he suffered from the collision[4] and that Darter did not file a worker's compensation claim. In support of the traditional portion of its motion, Elite attached Grogan's original petition, excerpts from Darter's deposition, Darter's affidavit, and excerpts from the deposition of Darter's wife Kristin, who served as Elite's bookkeeper and office manager.[5]

In his response to Darter's traditional motion, Grogan argued that genuine issues of material fact existed that precluded summary judgment and that the focus of the inquiry was not on whether Elite had expressly authorized Darter's negligent acts but rather on whether the act had been within the general authority given to Darter by Elite. Grogan complained that because Darter owned Elite, all of Elite's manifestations of consent existed at Darter's pleasure, particularly when Elite delegated to Darter the responsibility of overseeing any ongoing projects or pursuing new projects, whether he was onsite or not, and delegated how he accomplished such tasks. To his response, Grogan attached excerpts from Darter's and Kristin's depositions, Elite's articles of incorporation, the judgment in Darter's criminal case,

---

[4]Darter broke a tibia, an ankle, and some ribs in the collision.

[5]In the no-evidence portion of its motion, Elite argued that an adequate time for discovery had passed because it had been a year and a half since the lawsuit was filed, written discovery had been exchanged, depositions had been taken, and the motion was filed only a month before the extended discovery deadline. Elite argued that there was no evidence that Darter's tortious act was within the scope of his general authority, in furtherance of Elite's business, and for the accomplishment of the object for which he was hired.

the motor vehicle traffic accident report, the transcript of Darter's plea hearing, Grogan's life care plan, affidavits concerning costs and necessity, Darter's apology letter, some of Elite's bank and credit card statements, some credit card statements from Darter's personal credit card, Darter's first amended responses to and objection to Grogan's first set of interrogatories, a business records affidavit sponsoring rewards point redemption of Elite's business credit card, and Christian Grogan's affidavit.

The trial court granted Elite's motion for summary judgment without stating the basis therefore and issued a take-nothing judgment against Grogan before severing the instant claims from the underlying lawsuit.

## III. Discussion

In his fourth issue, Grogan complains that the trial court erred by granting the traditional portion of Elite's motion because genuine issues of material fact exist as to Elite's vicarious liability.[6]

---

[6]In his first three issues, Grogan argues that the trial court erred by granting no-evidence summary judgment because (1) an adequate time for discovery had not elapsed, (2) Elite withheld discoverable electronically stored information, and (3) Grogan offered more than a scintilla of competent summary judgment evidence to support each of the elements needed to establish his underlying causes of action against both Elite and its employee. While we would normally first review the trial court's judgment under rule 166a(i) when a party moves for summary judgment under both rules 166a(c) and 166a(i), because Grogan's fourth issue is dispositive, we address it first and need not reach his remaining three issues. *See* Tex. R. App. P. 47.1.

5

## A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 562 U.S. 1180 (2011); *see* Tex. R. Civ. P. 166a(b), (c). Once the defendant produces sufficient evidence to establish the right to summary judgment, the burden shifts to the plaintiff to come forward with competent controverting evidence that raises a fact issue. *Van v. Peña*, 990 S.W.2d 751, 753 (Tex. 1999).

## B. Respondeat Superior

Generally, a person has no duty to control the conduct of another. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007) (citing *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex. 1983)). Under the theory of respondeat superior, however, an employer may be vicariously liable for the negligent acts of its employee if the employee's actions are within the course and scope of his employment. *Id.*

(citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998)); *see Painter v. Amerimex Drilling I, Ltd.*, No. 16-0120, 2018 WL 2749862, at *3 (Tex. Apr. 13, 2018) ("Respondeat superior thus constitutes an exception to the general rule that a person has no duty to control another's conduct.").

To prove his respondeat superior theory, Grogan had the burden to show that, at the time of the negligent conduct, Darter (1) was an employee and (2) was acting in the course and scope of his employment. *See Painter*, 2018 WL 2749862, at *3. When the employment element is undisputed, the employer essentially concedes the existence of the right to control that is necessary to give rise to the employer-employee relationship. *Id.* at *4.

With regard to the "course and scope" element, vicarious liability arises only if (a) the tortious act falls within the scope of the employee's general authority in furtherance of the employer's business and (b) for the accomplishment of the object for which the employee was hired. *Id.* The tortious act must be of the same general nature as the authorized conduct or incidental thereto; this element hinges on an objective assessment of whether the employee was doing his job when he committed a tortious act.[7] *Id.* at *4–5, *10. "[I]f an employee deviates from the performance of

---

[7]In *Painter*, the court held that because the evidence showed that the driller's transporting himself and other workers to and from the place of work was merely part of his job as a member of the drilling crew, the act fell within the employer's general power of supervision, regardless of how much (or how little) control the employer actually chose to exercise of that particular task. 2018 WL 2749862, at *6. The court noted, however, that the driller was not required to travel directly between the

7

his duties for his own purposes, the employer is not responsible for what occurs during that deviation." *Id.* at \*4; *see Goodyear Tire & Rubber Co.*, 236 S.W.3d at 757 (holding that employee who was using work truck for personal errand when he fell asleep at the wheel and hit another vehicle was not acting in furtherance of his employer's business or for the accomplishment of the object for which he was hired even though he was available via pager 24 hours a day and not restricted from using the work truck for personal business); *Nationwide Prop. & Cas. Ins. Co. v. Revive Mfg., LLC*, No. 02-17-00148-CV, 2018 WL 2248667, at \*5 (Tex. App.—Fort Worth May 17, 2018, no pet.) (mem. op.) ("[W]e cannot ignore that the general rule for respondeat superior requires that the employee be acting in the course and scope of employment *when the negligence occurs*."); *see also Moore v. Strike, LLC*, No. 04-16-00324-CV, 2017 WL 96130, at \*4–6 (Tex. App.—San Antonio Jan. 11, 2017, no pet.) (mem. op.) (holding that employer was entitled to summary judgment when the evidence established that off-duty employee was driving his personal vehicle to supervisor's trailer for purely social, not business, purposes when he hit appellants' vehicles, even

---

bunkhouse and the work site and could stop for a meal, run a personal errand, or travel elsewhere rather than the bunkhouse and that if he had been engaged in any of those activities at the time of the accident, the course-and-scope analysis would be affected because an employer is not responsible for what occurs when an employee deviates from the performance of his duties for his own purposes, even if the deviation occurs with the employer's express or implied permission. *Id.* at \*9.

though during the course of socializing, co-workers might incidentally discuss the work day or events that occurred at work).

When it is proved that the vehicle involved in an accident was owned by the employer-defendant and the driver was an employee regularly employed by the defendant, a presumption arises that the driver was acting within the course and scope of his employment when the accident occurred. *Bell v. VPSI, Inc.*, 205 S.W.3d 706, 716 (Tex. App.—Fort Worth 2006, no pet.) (stating that the presumption arises from the fact of vehicle ownership by the employer and the driver's employment). The presumption is rebutted, however, by evidence that the driver had turned aside, even briefly, for a "personal errand" and had not yet returned to his mission when the accident occurred, and the plaintiff resumes the burden to produce evidence that the driver was in the course and scope of his employment. *Id.* The mere fact that an employer may pay for an employee's fuel likewise does not necessarily establish an act in the course and scope of employment. *Hervey v. Enerpipe, Ltd.*, No. 03-18-00252-CV, 2018 WL 3637327, at *3 (Tex. App.—Austin Aug. 1, 2018, no pet.) (mem. op.). And evidence that an employee is returning to work from a personal errand at the time of the accident rebuts the presumption that an employee was acting in the course and scope of his employment. *Molina v. City of Pasadena*, No. 14-17-00524-CV, 2018 WL 3977945, at *5 (Tex. App.—Houston [14th Dist.] Aug. 21, 2018, no pet.) (mem. op.).

9

It is undisputed that the motorcycle Darter was driving was titled in his name, not Elite's, but the parties dispute the significance of a payment from Elite's bank account to Darter's personal credit card bill for the month of his 2014 trip to Sturgis.

## C. Summary Judgment Evidence

### 1. Elite's Summary Judgment Evidence

Elite's summary judgment evidence showed that Darter had founded Elite, a metal fabrication company, in 2000 and had always been the company's president. Elite's business was "[f]abricating steel, structural steel, welding, sheet metal, metal construction," including repair welding, small structural components of some buildings, stairs, architectural railings, and "some maintenance level stuff"; its market area was primarily the Dallas-Fort Worth area, although it had occasionally performed work out-of-state in Louisiana and Tennessee, and it owned vehicles titled in its name. Darter's job duties and responsibilities were to oversee projects in the field, to oversee project managers' bidding on jobs, to bid on jobs himself, and to handle complaints from employees and customers.

Darter had been to the Sturgis Motorcycle Rally in 2013 with his friend Jody Delaney[8] and decided to go with Delaney again in 2014. He wanted to go in 2014 so that his wife could join him, stating "that was really the reason I want[ed] to go back because [sic] so she could go see it."

---

[8]Before his 2013 trip to Sturgis, Darter had been to a Republic of Texas motorcycle rally and to a motorcycle rally in Galveston.

Darter spent his first night there at a campground and had planned to check into a hotel on the second night. On the morning and afternoon of August 2, 2014, Darter drank alcohol at several bars: One Eyed Jacks, Easyriders, and Full Throttle. He left the campground around 9:30 a.m., arrived in Sturgis at around 10 a.m., and walked to the first two bars before going to Full Throttle, which was a few miles outside of Sturgis. He was en route from Full Throttle to the campground when the motorcycle collision occurred.

Darter carried workers' compensation insurance but did not file a workers' compensation claim for his injuries resulting from the collision. He and his health insurance provider paid for his medical expenses. Darter said that he never used his motorcycle to run errands for Elite or to fulfill company obligations. He averred that on the date of the accident, the only applicable insurance policy that he had was with Progressive because although he was named as an insured on a Nationwide policy, none of the motorcycles he owned, including the one that was involved in the collision, were listed on that policy. He further averred that although he was a named insured on a commercial automobile policy, he had been on a personal vacation and had not been in the course and scope of any business venture when the collision occurred.

11

**2. Grogan's Summary Judgment Evidence**

Grogan's summary judgment evidence showed that Darter held 51% of the stock in Elite, a closely held corporation with 27 employees[9] and that he was the boss, with the ultimate say in hiring and firing. He was accessible and on-call for Elite "24/7" by keeping his company-paid cell phone with him everywhere, including on his trip to Sturgis. Darter said that he would just not answer the phone when he did not want to take a business call. Elite paid Darter a weekly salary but provided him with no health insurance, disability insurance, or retirement.

Darter planned his trip to Sturgis with the idea that his wife Kristin would meet him up there. At the time of the collision, he had been heading west, to Sturgis, so that he could connect to the road that would take him south to Tilford, to the campground, to collect his luggage.

If the collision had not occurred, Darter would then have driven north to get back to Sturgis so that he could head west to the hotel in Spearfish, where he was planning to meet up with "some guys from Dallas," depending on what his and his wife's schedules looked like. He knew the guys would be there because that group went to the motorcycle rally "all the time." He described them as "Strokers Dallas," a group of guys in the motorcycle industry from whom he had purchased one or two motorcycles. He knew that at least two men from Strokers would be there, although

---

[9]Darter's project management employees were paid a salary, while people below the project managers were hourly employees.

he did not know whether Rick Fairless, the owner, would be there because they did not have any set plans. Darter said that Strokers "usually ha[d] a bike show . . . in Spearfish and that's really what [he would have] liked to have seen."[10] Strokers had an in-house metal fabrication shop.

Darter was the accountholder for Elite's Capital One credit card, a business credit card. Darter and Kristin were the accountholders for a Bank of America credit card, a personal credit card account upon which business-related expenses were occasionally charged.

The collision occurred on August 2, 2014. The July 29–August 29, 2014 account record for Darter's Bank of America card showed $847.22 in purchases during the relevant time period—at a gas station in Oklahoma on July 31, 2014 ($210), at a Wal-Mart supercenter in Nebraska on August 1, 2014 ($401.94), and at a Howard Johnson hotel in Spearfish, South Dakota, on August 3, 2014 ($235.28)—as well as a $9,000 cash advance to a bondsman in Whitewood, South Dakota, on August 3. The Bank of America card carried a balance of $37,679.20 during the July 29–August 29, 2014 period, with a total credit line of $39,100.

---

[10]In his response to Elite's motion, Grogan listed a website URL for Strokers, but he did not request that the trial court take judicial notice of it or list it as summary judgment evidence. Elite objected to the website URL as not properly authenticated under rules of evidence 901 and 902.

The August 16–September 15, 2014 account record for the Capital One card shows no purchases made before August 20.[11] The Capital One card carried a balance of $2,220.89 during the August 16–September 15, 2014 period; its limit was $4,000.

Elite's banking records showed payments from its account for both the Bank of America and Capital One bills. The August 2014 banking records show a $1,000 payment to Bank of America on August 15, 2014, and a $1,000 payment to Capital One on August 20, 2014. Kristin handled Elite's finances and was the only person who could authorize payments from Elite's bank account.[12] Kristin said there was no

---

[11]The other Capital One account record shows transactions from April 15 to May 15, 2014, with three transactions and a balance of $3,708.24. The record does not contain an account record showing transactions immediately before or after the collision on August 2.

[12]Elite's banking records showed payments to the Bank of America account of over $30,000 between February 2014 and January 2015: $2,000 on February 26, 2014; $1,000 on May 30, 2014; $1,200 on June 18, 2014; $1,500 on July 8, 2014; $1,000 on July 22, 2014; $1,000 on July 24, 2014; $1,000 on July 28, 2014; $1,000 on August 15, 2014; $2,000 on September 9, 2014; $2,000 on October 14, 2014; $2,255.10 on October 27, 2014; $2,000 on October 28, 2014; $1,000 on October 31, 2014; $3,000 on November 10, 2014; $2,000 on November 28, 2014; $1,500 on December 2, 2014; $1,500 on December 8, 2014; $1,500 on December 17, 2014; $1,000 on January 5, 2015; $1,000 on January 13, 2015; and $3,000 on January 20, 2015.

During the same time period, Elite paid to Capital One almost $25,000: $1,530.30 on March 17, 2014; $500 on May 7, 2014; $750 on June 5, 2014, and $500 on June 18, 2014; $500 on July 8, 2014, and $1,000 on July 31, 2014; $1,000 on August 20, 2014; $1,468.40 on September 11, 2014; $1,000 on October 14, 2014; $1,220.89 on November 3, 2014, $321.94 on November 7, 2014, $608.27 on November 10, 2014, and $253.80 on November 17, 2014; $1,142.95 on December 2, 2014, $2,000 on December 9, 2014, and $1,000 on December 17, 2014; $721.80 on January 7, 2015; $1,396.22 on January 12, 2015; $1,032.03 on January 13, 2015; $1,208.15 on January 14, 2015; $1,703.36 on January 16, 2015; $567.57 and $1,555.62 on January 20, 2015;

14

means to separate payment of funds to company versus personal charges because "there is a previous balance on the cards" but that she did "not use the company funds to pay for purchases that are personal on the card" and that "personal expenses are not entered into [Elite's] accounting system."

### 3. Elite's Summary Judgment Reply Evidence

To its summary judgment reply, Elite attached additional deposition excerpts from Kristin and Darter. Kristin testified that Elite provided structural steel for building remodeling and for handrails, stairs, and decoration. She also stated that Elite did not fabricate metal pieces to go in anything other than buildings.

Kristin also testified that the Capital One (business) credit card's rewards points had been used for Darter's travel expenses in connection with his September 2014 arraignment after the August 2, 2014 arrest, but she distinguished use of the rewards points from other travel expenses for the arraignment,[13] which she said were not put on that card.

---

$150 on January 22, 2015; $521.64 on January 26, 2015; and $986.64 on January 30, 2015.

[13]In this, Kristin appears to have considered credit card rewards points like the IRS treats airline miles. *See* Eric G. Roscoe, *Taxing Virtual Worlds: Can the Irs Pwn You?*, 12 U. Pitt. J. Tech. L. Pol'y 1, 10–11 (2011) (explaining the taxation dilemma posed by frequent flyer miles accrued on a business trip that an employee later uses for personal trips—while these were determined to be gross income to the employee, "[d]ue to an outcry from the public, the IRS . . . ultimately decided not to tax frequent flyer miles unless they were exchanged for cash").

Darter testified that Fairless went to the Sturgis Motorcycle Rally every year, "that's kind of like his thing, and, you know, if you want to see the best bikes you go where those guys are." Darter stated that Fairless had been going to the rally for a long time and usually had to take some employees with him to handle the workload. Darter said that Fairless was the only person he had looked to hang out with and that he had also planned to "just maybe see more scenery than [he] had seen the year prior, especially with [his] wife." He left all of the bookkeeping up to his wife, both personally and professionally.

## D. Analysis

### 1. Scope of General Authority

Grogan's theory appears to be that because Darter owned the controlling interest in Elite and managed the business, anything Darter did was—de facto—an act authorized by Elite. *Cf. U.S. KingKing, LLC v. Precision Energy Servs., Inc.*, 555 S.W.3d 200, 213 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (describing "alter ego" theory to hold an owner liable for a corporation's obligations as applying when there is such unity between corporation and individual based on their total dealings—including the degree to which corporate and individual property have been kept separate—that holding only the corporation liable would result in injustice). But such a theory ignores our long history of absolving a corporation of negligence when its employee embarks on a "frolic[] of his own." *McNeal v. Home Ins. Co.*, 112 S.W.2d 339, 342 (Tex. Civ. App.—Galveston 1937, no writ) (noting that to conclude that

16

employee was on his way to have fender repaired and thus had resumed the scope of his employment would require that act "be entirely isolated for that purpose from the series of drinks, drives and dances that punctuate[d] this entire night of revelry covering the counties of Matagorda, Wharton, Fort Bend, and Brazoria"); *see Painter*, 2018 WL 2749862, at *4 ("[I]f an employee deviates from the performance of his duties for his own purposes, the employer is not responsible for what occurs during that deviation.").

Darter averred that he was on vacation when the collision occurred, and nothing in the record directly contradicts this account because there is no evidence that he was actively (or passively) overseeing any projects, bidding on any welding jobs, or handling any complaints from employees or customers—the conduct authorized by his work for Elite—while engaging in drinking alcohol and riding motorcycles in South Dakota. Darter testified that he had never used his motorcycle to run errands for Elite or to fulfill company obligations.

Grogan argues that Darter's testimony that he had plans to meet up with Fairless showed that he arguably intended to meet with someone with whom he could pursue potential business opportunities for Elite in the DFW market area. But while Darter testified that he had plans to meet "some guys from Dallas" from whom he had purchased motorcycles in the past, nothing in the record tends to indicate that he was planning to meet with them about Elite's business or that Darter was planning to try to sell Elite's architectural and structural welding services, used in constructing

17

buildings, to a motorcycle operation. Accordingly, we conclude that there is no genuine issue of material fact with regard to whether Darter's tortious act was within the scope of his general authority for Elite, and we overrule this portion of Grogan's fourth issue.

### 2. Furtherance of Business

Likewise, because Darter testified that he could decline to answer business calls, and there is no evidence that he was taking business calls at the time of the collision, nothing in the record reflects that his actions during the day of the collision were in furtherance of Elite's business.[14]  *See Goodyear Tire & Rubber Co.*, 236 S.W.3d at 757; *Moore*, 2017 WL 96130, at \*4–6. Even if he had been planning to try to do a business deal with the Strokers crowd in Spearfish, at the time of the collision, he had not been driving to a meeting in Spearfish but rather to a campground to retrieve his belongings. There is nothing to show that Elite had the right and power to direct and control Darter in the performance of his driving back to the campground or that his return to the campground had anything to do with Elite. *See Bell*, 205 S.W.3d at 715. We overrule this portion of Grogan's fourth issue.

---

[14]If Darter had been taking a business call on his motorcycle at the time of the collision, our analysis might be different. *See, e.g.*, Isaac A. Hof, Comment, *Wake-up Call: Eliminating the Major Roadblock that Cell Phone Driving Creates for Employer Liability*, 84 Temp. L. Rev. 701, 701 (2012) (noting that cell phones enable employees to conduct business far beyond the confines of their workplace and well past their normal working hours, including the transmission of work-related documents, emails, and text messages while driving).

### 3. Accomplishment of Objective

Grogan contends that the evidence shows that Elite paid for Darter's travel expenses to Sturgis—the gas station charge in Oklahoma, the Wal-Mart charge in Nebraska, and the lodging in Spearfish, South Dakota—via the $1,000 payment from Elite's bank account to Darter's Bank of America account. Grogan refers us to *GuideOne Mutual Insurance Co. v. Grace Christian Center of Killeen, Tex., Inc.*, 156 F. Supp. 3d 831 (W.D. Tex. 2015), and *Rose v. Odiorne*, 795 S.W.2d 210 (Tex. App.—Austin 1990, writ denied), to support his argument that Elite's paying for Darter's travel expenses should have precluded summary judgment. Both cases are distinguishable.

In *GuideOne*, an insurance company sought a declaration that it did not have to indemnify a Killeen church in an underlying lawsuit that arose from a fatal car crash in which three church employees were killed while riding in the church's van. 156 F. Supp. 3d at 833. Two of the employees were returning from a trip, and the third had gone to the airport to pick them up. *Id.* at 833–34. On the way back to Killeen, a tire on the van blew out, causing the van to roll. *Id.* at 834. The court considered whether the travelers had been in the course and scope of their employment by the church in determining whether a policy exclusion applied to them. *Id.* at 837 (referencing *Askew v. Matthews*, No. 01-90-00488-CV, 1991 WL 188711, at *7 (Tex. App.—Houston [1st Dist.] Sept. 26, 1991, no writ) (not designated for publication)). The court noted that the rebuttable course-and-scope presumption arose from transportation furnished by the employer (the church van), shifting the burden to the

19

insurer to present evidence that the employees were not acting in the course and scope of their employment. *Id.*

The court considered evidence with regard to whether the trip had been more personal in nature or for business when they had mixed both vacation and work time. *Id.* at 838. The church had paid all known expenses for the trip, which had totaled at least $14,000, and the trip's purpose was for the employees to attend a religious conference and to give speeches at the conference in their official capacities as ministry. *Id.* (observing that international travel to attend such conferences was included in the employees' job descriptions and employee handbook). In denying the insurer's motion for summary judgment, the court concluded that the competing evidence revealed a number of fact issues with regard to whether the trip had been a business trip, a personal vacation, or some combination thereof. *Id.* at 838–40. There are no comparable fact issues here.

In *Rose*, a worker's compensation case, the court reversed a summary judgment after determining that there were material fact issues with regard to whether the appellant was injured while acting within the course of his employment. 795 S.W.2d at 212. The appellant had been injured in a car accident when he commuted from the drilling rig to his home 80–90 miles away in his own car, which he was paid to drive to and from the drilling rig (a fact set similar to that in *Painter*). *Id.* The appellant's employer attempted to dodge its worker's compensation obligation by arguing that

the appellant was injured while neither in the course of his employment nor in furtherance of the employer's business. *Id.*

The court noted that the fact that the employer paid the appellant $20 per day for transportation prevented the injury from being automatically excluded from coverage under the general rule that commuting expenses are not course-and-scope activities but that this just permitted the appellant to show that his injury was otherwise compensable—the appellant still had to prove that his injury satisfied the "course and scope" requirement to recover for it. *Id.* at 213–14. Specifically, an employer's gratuitous furnishing or paying transportation as an accommodation to the worker and not as an integral part of the employment contract does not by itself render compensable an injury occurring during such transportation. *Id.* at 214. The court held that while the proof did not establish that the appellant was in the course of his employment at the time of injury, the undisputed proof that the well-site was far away and required a four-hour daily drive, that the employer had a plan for transporting the workers together, that the well-site was remote, and that the employer paid compensation for the travel precluded it from holding as a matter of law that the appellant was not acting in the course of his employment. *Id.* at 215. As with *GuideOne*, there are no comparable fact issues in the instant case.

Grogan also directs us to *Wilhoit v. Iverson Tool Co.*, 119 S.W.2d 709 (Tex. Civ. App.—Beaumont 1938, writ dism'd by agr.), for the proposition that there was a dual purpose for Darter's trip to South Dakota. In *Wilhoit*, after the trial court granted a

21

judgment notwithstanding the verdict for the employer, the appellant argued that the employee had been acting in the course of his employment when he hit her car. *Id.* at 710. The court determined that there was sufficient evidence to support the jury's finding that the employee had been acting in the course of his employment: The employer was an oil field supply business, and it provided a company vehicle to its branch manager, who performed outside sales duties covering the East Texas oil fields over several counties and who had the authority to hire and fire employees and to decide how to sell the equipment. *Id.* To do this, the company provided him with an expense account. *Id.* On the night of the collision, he had gone to a hotel to wait around for his wife and ran into two friends, both of whom owned oil wells. *Id.* at 711. He did not try to sell anything to them or talk business that evening, but the court noted that it was "plain from his testimony, however, that he would have made a sale to [the men] that night or to anyone else, had the occasion arose" because he "considered such mixing around with people in the oil producing business necessary to the success of the business of Iverson Tool Company." *Id.* The court reasoned that when the employee was largely his own boss, who regulated his own hours of work and whose main duties included cultivating the acquaintance and friendship of men in the oil producing business as potential customers of his employer's oil field supply business, his visiting with them at the hotel was "unquestionably in the general scope of the duties he was employed to perform." *Id.* at 712. In contrast, the record here is devoid of any evidence to support a finding that "Stroker Dallas," a

22

motorcycle group, had any interest in the type of building metal fabrication sold by Elite.

Grogan also refers us to *Gilgon, Inc. v. Hart*, 893 S.W.2d 562 (Tex. App.—Corpus Christi 1994, writ denied). In *Gilgon*, the court held that the trial court did not err by refusing to submit the appellant's requested jury instruction on when an employee acts outside the scope of his employment by pursuing his own purpose unconnected with his employment because the uncontroverted evidence established that the employee's employment was not limited along conventional lines: he lived in a trailer on the premises where he worked seven days a week, attending matters daily and as they arose, and the employee was allowed to combine his personal errands with business errands. *Id.* at 567–68. To obtain the desired instruction, the employer would have had to present more than a scintilla of evidence that the employee would have gone on the same errand even if he had to cancel the work-related trip and that the employee would not have made the work-related trip if the personal errand were cancelled, but the record there "barely hint[ed] that [the employee] may have departed from the course of his employment." *Id.* at 568. In contrast, nothing on this record shows that Darter was acting within the course and scope of his employment when he drank alcohol and then rode his motorcycle on his way to a campground to pack up his personal belongings before going to a hotel where his wife would be joining him. If he had not been in the collision, he might have encountered individuals interested

23

in motorcycles, but not—on this record—the type of metal fabrication business performed by Elite.

Based on the record, Elite's objective was to sell steel and welding services to the building construction industry in the DFW area through bidding jobs. Notwithstanding Elite's financial records, nothing in the record supports a conclusion that Darter's trip was undertaken to accomplish that objective.

And while the record reflects that Darter put $611.94 in purchases on his personal credit card between July 31, 2014 and the August 2, 2014 accident, followed by $235.28 for a hotel room after the accident, we do not think that the $1,000 payment to Bank of America on August 15, 2014, necessarily correlates with Elite's having paid for Darter's Sturgis travel expenses. By the end of that month, that card was carrying a balance of $37,679.20, of which at least some percentage was attributable to Elite's business expenses. While Elite paid over $30,000 on Darter's personal credit card over the course of the year, the record does not reflect what percentage of the charges were business expenses other than Kristin's testimony that she did not use Elite's funds to pay for personal expenses that were on the card. No expenses for the trip were put on Elite's business credit card, and Elite did not pay for Darter's injuries through worker's compensation or in any other manner.

Accordingly, we cannot say under the circumstances and record presented here that the fact that Elite paid $1,000 on Darter's personal credit card for the billing period that happened to include $611.94 in personal travel expenses reasonably could

24

mean that Elite was paying for Darter's travel expenses such that he was acting in the course and scope of his employment when his motorcycle collided with Grogan's. We overrule the remainder of Grogan's fourth issue.

## IV. Conclusion

Having overruled Grogan's fourth issue, which is dispositive of this appeal, *see* Tex. R. App. P. 47.1, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: December 6, 2018